**In the Interest of K.L.**

**No. 09–11–00083–CV.**

Court of Appeals of Texas, Beaumont.

Submitted on March 16, 2012.

Decided May 31, 2012.

Kathleen E. Matheu, Michael L. Davis, Kerry Carl Hagan, Kerry C. Hagan, P.C., Coldspring, TX, for Appellants.

Luisa P. Marrero, Office of General Counsel, Austin, TX, for Appellee.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## MEMORANDUM OPINION

HOLLIS HORTON, Justice.

This is a parental-rights termination case. Following a jury trial, the trial court signed a judgment terminating the parental rights of appellants M.L. (Mother) and J.A.J. (Father) to their minor child, K.L. Based on the jury's findings, the trial court appointed the Texas Department of Family and Protective Services (the Department) to serve as K.L.'s sole managing conservator. Mother, Father, and an intervenor, A.T. (Grandmother), have each appealed from the trial court's judgment.

### Background

In August 2009, shortly after receiving a report that K.L. had sustained a serious injury while at home, the Department initiated proceedings to remove K.L. from Grandmother's home. Before her removal, K.L. resided with Grandmother. Shortly before K.L.'s injury, Grandmother, her two sons, and K.L. moved into a one-bedroom loft apartment. When they moved to the apartment, K.L. was two years old, and neither of Grandmother's sons were yet fifteen. Grandmother left

the three children without adult supervision in the apartment to shop for groceries. While Grandmother was gone, K.L. fell from the apartment's interior stairs to the tile floor below, suffering several fractures to her jaw. At the time, the apartment's interior stairs did not have rails.

Following a trial in January 2011, the jury found four separate grounds to support terminating Mother's parental rights, the jury also found that terminating Mother's rights was in K.L.'s best interest. *See* Tex. Fam.Code Ann. § 161.001(1)(D), (E), (K), (O) and (2) (West Supp.2011).[1] The jury also terminated Father's parental rights, and found that terminating his rights was in K.L.'s best interest. *Id.* § 161.001(1)(D), (N), (O) and (2). The jury named the Department as K.L.'s sole managing conservator, and found that Grandmother should not be named as K.L.'s possessory conservator.

## Relinquishment

On appeal, Mother and Grandmother challenge the sufficiency of evidence to support the jury's finding that Mother voluntarily relinquished her parental rights. Mother and Grandmother also challenge several of the trial court's evidentiary rulings. Before we address whether there is sufficient evidence to support the jury's findings, we address Mother's and Grandmother's claims that challenge the trial court's rulings admitting certain evidence, as these rulings relate to the evidence

supporting the jury's findings on the relinquishment issues.

Four of Mother's fifteen issues and Grandmother's first issue address the validity of Mother's June 2010 affidavit and whether it was properly admitted at trial.[2] On June 4, 2010, Mother signed an affidavit of relinquishment, and the trial court admitted the affidavit during trial. *See* Tex. Fam.Code Ann. § 161.001(1)(K) (The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by this chapter[.]").

■ Mother and Grandmother argue that Mother's June 2010 affidavit was inadmissible because the jurat accompanying the affidavit does not assert that the information in the affidavit is true and correct. *See id.* § 161.103 (West 2008) (providing that certain provisions are to be included in an affidavit of voluntary relinquishment of parental rights). During the trial, Mother and Grandmother objected to the Department's request to admit the June 2010 affidavit on this basis, but the trial court overruled their objections. Mother and Grandmother also argue that the Department failed to prove, by clear and convincing evidence, that Mother's June 2010 affidavit contains the verification they contend Section 161.103 of the Texas Family Code requires. *See id.* The verifica-

1. We cite to the current version of the Texas Family Code because the 2011 amendment does not affect the outcome of this appeal.

2. To raise issues related to a terminated parent's rights in addition to the issues relating to appointment as a managing or possessory conservator, the intervening grandparent must possess a justiciable interest in the terminated parent's rights. *In re H.M.J.H.*, 209 S.W.3d 320, 321 (Tex.App.-Dallas 2006, no pet.). A probate court appointed Grandmoth-

er as Mother's guardian on July 26, 2010. Grandmother's brief is submitted individually and in her capacity as Mother's guardian. Mother has been represented by court-appointed counsel, who filed a separate brief on Mother's behalf. Grandmother's rights to serve as possessory conservator were also adjudicated during the trial. Given Grandmother's justiciable interests, we address the issues Grandmother has raised.

tion accompanying Mother's affidavit does recite that it was signed under oath in the presence of witnesses.

 Generally, "[a]n affidavit which does not positively and unqualifiedly represent the facts as disclosed in the affidavit to be true and within the affiant's personal knowledge is legally insufficient." *Humphreys v. Caldwell*, 888 S.W.2d 469, 470–71 (Tex.1994). "However, where the affidavit reflects that it is based on personal knowledge and it is subscribed to and sworn before a notary public, it is not defective if, when considered in its entirety, its obvious effect is that the affiant is representing that the facts stated therein are true and correct." *Franks v. Brookshire Bros., Inc.*, 986 S.W.2d 375, 378 (Tex. App.-Beaumont 1999, no pet.).

Mother's June 2010 affidavit recites that Mother appeared and swore under oath to various facts as denoted by the paragraphs in the affidavit that are in quotation marks. It is obvious that the facts within the quotation marks of the affidavit are the parts that Mother verified as being true and correct. We conclude that Mother has sworn to the truth of the facts found within the quotation marks of her June 2010 affidavit, as required by section 161.103 of the Family Code. We hold that Mother attested to the facts in her affidavit that are in quotations, so it is a verified affidavit; therefore, the trial court did not err in overruling the objections that Mother and Grandmother made to Mother's June 2010 affidavit.

 Mother and Grandmother also challenge the sufficiency of the evidence supporting Mother's termination, arguing that the jury could not form a firm conviction that Mother had voluntarily relinquished her parental rights from the evidence before the jury. In resolving the issues, the jury chose to reject the argument that Mother did not understand the conse-

quences resulting from a decision to sign the affidavit of relinquishment. To give appropriate deference to the jury's conclusions in a legal sufficiency review, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so[ ]" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). In a factual sufficiency review, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* Under a factual sufficiency standard, the findings are sufficient unless, based on the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction[ ]" that the fact at issue was true. *Id.*

In this trial, the jury heard testimony that is inconsistent with Mother's claim that she did not voluntarily relinquish her parental rights. Stephanie Miller, a licensed professional counselor, treated Mother on a regular basis from November 2009 through November 2010. According to Miller, she and Mother discussed the prospect of Mother relinquishing her parental rights before Mother signed the June 2010 affidavit. At numerous sessions, according to Miller, she and Mother discussed the advantages and disadvantages of terminating Mother's parental rights. During these sessions, Mother told Miller that she did not feel that she could raise K.L. by herself, but, on the other hand, Mother also stated that she was very bonded with K.L. and wanted to be able to spend time with her. As of their session in early June 2010, the one nearest the date that Mother executed the

affidavit at issue, Mother "was leaning towards relinquishing." Miller testified:

> I felt like it was my job to help her look at the pros and cons, not to lead her to any certain direction, and she appeared to be able to weigh those pros and cons. And the last session I had, she was leaning towards relinquishing her rights, and she seemed to have a good grasp on that. She didn't seem to be confused.

Miller's progress note of June 1, 2010, states that Mother "indicated that she does not believe that she can properly care for her child and also does not believe that her mother would do any better job raising her child based on her own childhood experiences." Miller's June 1, 2010 progress note also states that Mother indicated that she was leaning toward relinquishing her parental rights because the foster family where K.L. was currently living "would be able to provide her with a better life" than she could. In the same progress note, Miller noted: "I am impressed with [Mother's] maturity and insight into the situation." Finally, Miller's note states that Grandmother "has created so much chaos and has not been a source of support for [Mother] during this CPS case." Miller's progress note of June 8, 2010, reflects that Mother told Miller that she had approached the Department supervisor before the hearing and stated that she wanted to go forward with the termination. During trial, Miller also testified that despite Mother's mental handicap, she had good insight, loved K.L., but knew "that she couldn't take care of her by herself at this point in her life." Miller's testimony and progress notes generally support the jury's determination that Mother's decision to terminate her rights to K.L. was a decision that Mother understood and made voluntarily.

■ In reaching its conclusion that Mother's decision relinquishing her parental rights was voluntary, the jury apparently chose to give little weight to Grandmother's guardianship application and the decision of the San Jacinto County Judge to grant the application. Reasonable jurors can also reasonably decide to ignore some of the testimony of the witnesses in resolving contradictions in the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827, 830 (Tex.2005) (stating "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."). On July 1, 2010, Grandmother filed an application in San Jacinto County asking that the court appoint her to be the guardian of Mother's person. Grandmother's guardianship application is supported by a guardianship capacity assessment letter, verified by Dr. Venkatesh, the psychiatrist who testified at trial. The assessment letter authored by Dr. Venkatesh states that Mother's ability to understand or communicate was severely affected by her bipolar illness, but also indicates that Mother's mental retardation was not a basis for her incapacity. Dr. Venkatesh also states in the assessment letter that Mother did not have full mental and intellectual capacity to be able to properly consider, weigh, and evaluate the factors involved to agree to voluntary termination of her parental rights to K.L. On July 26, 2010, the County Judge of San Jacinto County granted Grandmother's application to be Mother's guardian. The order of July 26, 2010 appointing Grandmother was in evidence, and recites:

> The proposed ward is suffering from bipolar disorder and her incapacity has been certified by her physician to the court; she has also been certified by the United States Social Security Administration as mentally retarded and receives full disability payments from said agency, with impaired judgment and

abilities, which is evidenced by recurrent acts showing lack of self-care and ability to manage her own person and financial affairs without full-time institutional care and assistance for a period of 6 months prior to this order, which condition is not established by mere isolated instances of negligence or bad judgment.

While the decision of the County Judge regarding Mother's incapacity was informed by Dr. Venkatesh's assessment letter, the jury had the advantage of Dr. Venkatesh's testimony, as he was one of the witnesses who testified at the trial resulting in the termination of Mother's parental rights. The record reflects that Dr. Venkatesh had been treating Grandmother for a bipolar illness for two or three years. The record also reflects that Dr. Venkatesh treated Mother during some portions of that period as well. At trial, Dr. Venkatesh testified that Mother had bipolar disorder and borderline intellectual functioning. Dr. Venkatesh's records indicate that he began seeing Mother in January 2008, and he saw her ten times during that year. Dr. Venkatesh's note of May 29, 2008, reflects that Mother was doing well, had been taking her medications very regularly, and that she had good judgment and insight. Dr. Venkatesh's next note, dated June 26, 2008, reflects that Mother had a sudden setback in her condition and that she had not been taking her medication every day. Dr. Venkatesh also saw Mother six times in 2009. These records show that Mother was generally compliant with respect to her medications, but also reflect that on some visits, Dr. Venkatesh felt Mother had poor insight and judgment. However, Dr. Venkatesh did not see Mother in 2010 prior to the time Mother signed the June 2010 affidavit, but he did see Mother on June 25, 2010. Dr. Venkatesh's June 25 progress note indicates that Mother's medication compliance had been irregular and that Mother was not taking her medications every day. On that visit, Dr. Venkatesh noted that Mother had poor judgment and insight. During trial, Dr. Venkatesh explained that at the time he saw Mother in late June 2010, Mother was not doing well, posed a danger to herself and her child, and he felt Mother needed a guardianship to ensure her compliance with treatment.

Dr. Venkatesh was also Grandmother's psychiatrist. He acknowledged that Grandmother is also bipolar, but he felt that Mother's illness was more severe; Dr. Venkatesh also expressed the opinion that Mother's borderline intellectual functioning affected her prognosis. At the time he prepared Mother's guardianship capacity assessment letter, he was aware that Grandmother was going to be seeking guardianship. When asked why he thought Grandmother should become Mother's guardian, Dr. Venkatesh explained that Grandmother, at times, cried uncontrollably because she missed K.L. and could not take care of her, that Grandmother had improved remarkably, and that he thought Grandmother would be able to take care of her daughter and granddaughter.

Nevertheless, Dr. Venkatesh's testimony concerning Mother's capacity at the time she signed the June 2010 affidavit was equivocal. During the trial, Dr. Venkatesh testified that his statement concerning Mother's relinquishment not having been voluntary was speculation, and with respect to whether Mother's decision was a voluntary one, he testified: "I do not know." Additionally, Dr. Venkatesh stated that he had talked to Mother at times about giving up K.L. and that she indicated to him that she agreed to it. In assessing the weight to give Dr. Venkatesh's testimony, the jury was entitled to consider his testimony that he did not know

whether Mother's decision was voluntary, as well as whether having both Mother and Grandmother as patients made his opinion less than objective.

The jury could also consider Mother's testimony; no party objected to her competence to testify. Mother acknowledged that she had executed the June 2010 affidavit of relinquishment. According to Mother, she signed the affidavit of relinquishment to allow Grandmother "to have the baby and that I would still be able to be involved with the baby's life." The jury could have viewed this testimony as showing that Mother understood that signing the affidavit changed her rights, even in the face of Mother's further claim that she did not understand that signing the affidavit caused her to lose all of her legal rights to parent K.L.

It was also apparent to the jury that Mother had the ability to read and write, as Mother testified that she had graduated from high school. The exhibits that were admitted before the jury include Mother's signed, handwritten statement demonstrating her ability to read. The June 2010 affidavit lists Mother's parental rights, and recites that Mother understood that by naming the Department as K.L.'s managing conservator she gave "up all my parental rights and grant them to the Department and/or to the adoptive parents with whom my child may be placed." The affidavit also recites that "this affidavit, once signed, is irrevocable[.]" With respect to determining whether Mother had voluntarily relinquished, the jury could also consider Mother's testimony acknowledging that she did not feel that she could take care of K.L. by herself. During the trial, Mother also admitted that she could not provide the day-to-day management, control and assistance that a child requires.

Although there is evidence from which a jury could have decided that Mother's decision to relinquish was not knowing and voluntary, there was also evidence from which the jury could reasonably conclude otherwise. The language in the June 2010 affidavit outlining a parent's rights is clear, and Mother's affidavit also contains language, in bold print, stating that upon signing the affidavit, the decision is irrevocable. In concluding that Mother's decision was voluntary as well as knowing, the jury could also reasonably rely on Mother's psychiatric records tending to show that she had good judgment and insight when on medication, and the testimony of Stephanie Miller, her counselor, who saw her near the time that Mother executed the affidavit. At trial, Miller expressed her opinion that Mother's decision to relinquish K.L. was both informed and voluntary. Viewing the evidence in the light most favorable to the jury's verdict, the jury could reasonably believe that Mother knowingly and voluntarily decided to relinquish her parental rights, but that, shortly after signing the June 2010 affidavit, Mother moved in with Grandmother, got off her medications, and then changed her mind about completely relinquishing parental rights.

Juries are to decide "the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary." *City of Keller*, 168 S.W.3d at 819 (footnotes omitted). As the fact finder, the jury resolved the conflicts in testimony regarding Mother's capacity to make a voluntary decision to relinquish her parental rights. *See id.* at 821. As the finder of fact, the jury had sufficient evidence to reasonably form a firm belief that Mother knowingly and voluntarily signed the June 2010 affidavit.[3]

---

**3.** The charge required that it be shown by

clear and convincing evidence that Mother

In summary, we hold the trial court did not err in admitting the June 2010 affidavit into evidence, and we hold the evidence is legally and factually sufficient to support the jury's finding on one of the alleged statutory grounds for termination of Mother's rights. *See* Tex. Fam.Code Ann. § 161.001(1)(K). We overrule Grandmother's first issue and Mother's first, second, third, and eighth issues. Because the judgment terminating Mother's parental rights is supported on one of the statutory grounds for termination, we do not reach other issues raised by Mother and Grandmother challenging the jury's findings on other statutory grounds. *See* Tex.R.App. P. 47.1. Accordingly, we do not reach Grandmother's second issue and Mother's sixth, seventh, and ninth issues.

## Medical Records

■ In issue four, Mother complains the trial court overruled Grandmother's hearsay objection to the admission of K.L.'s hospital records which concerned the treatment K.L. received as a result of her fall. However, Mother did not object that these hospital records included inadmissible hearsay during the trial. "[O]ne party may not use another party's objection to preserve an error where the record does not reflect a timely expression of an intent to adopt the objection." *Daniels v. Yancey*, 175 S.W.3d 889, 892 (Tex.App.-Texarkana 2005, no pet.) (citation omitted). While Mother lodged a general relevancy objection to much of the information in the hospital records, such a general objection on relevancy grounds is not sufficiently specific. *See* Tex.R. Evid. 103 (requiring that objections be specific). A general objection to evidence as a whole, which does not specify the portion objected to, may properly be overruled if any part of that evidence is admissible. *Speier v. Webster College*, 616 S.W.2d 617, 619 (Tex.1981) (quoting *Brown & Root, Inc. v. Haddad*, 142 Tex. 624, 180 S.W.2d 339, 341 (1944)).

■ In this case, medical records relevant to K.L.'s fall from the stairs were generally admissible. *See* Tex.R. Evid. 803(4), (6). Mother should have directed the trial court to the specific parts of K.L.'s hospital records that she believed were not relevant. Mother's objections to K.L.'s hospital records were not preserved for our review. We overrule Mother's fourth issue.

## Best Interest

■ Mother's thirteenth issue and Grandmother's third issue challenge the legal and factual sufficiency of the evidence supporting the jury's finding that terminating Mother's parental rights is in the best interest of K.L. The non-exhaustive list of factors considered in determining the best interest of a child include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of

knowingly and intelligently executed the affidavit to relinquish her parental rights. On appeal, the Department argues that Mother bore the burden of proving that she did not voluntarily execute the affidavit. However, the Department did not object to the manner the trial court allocated the burden on this issue. We measure a challenge to the suffi-

ciency of the evidence against the charge submitted, and not against a hypothetical charge that the jury was not given when the party complaining about the placement of the burden in the charge has not lodged timely objections on that basis. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000).

the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976).

The parties acknowledge that Mother cannot adequately meet K.L.'s needs, but they argue that termination of Mother's rights is not in the best interest of K.L. because Mother intended to have Grandmother's help in raising K.L. The Department argues that the relationship between Mother and Grandmother is too tumultuous to ensure that K.L. would remain in a stable home. The Department suggests that Grandmother lacks the ability to provide a safe and stable environment for K.L.

The record contains evidence supporting the Department's argument. Even though Mother and Grandmother expressed the desire to work together in raising K.L., the jury was aware that Mother's and Grandmother's past relationship had been difficult, as Mother had previously been unable to live with Grandmother for extended periods. After K.L.'s birth and while Mother was still attending high school, Grandmother sent Mother to live with Mother's uncle. Since K.L.'s birth, Mother had moved in with a succession of other families leaving K.L. with Grandmother because, in Grandmother's words, Mother "would go and get a little break[ ]" from the pressures of living in Grandmother's household.

In evaluating whether the termination of Mother's parental rights served K.L.'s best interest, the jury also considered the testimony by Amanda Jackson, the Department's supervisor, explaining why the Department did not consider Grandmother's home as an appropriate placement. According to Jackson, the Department had first become involved with Grandmother when Mother was a child and Grandmother's sons were younger. Grandmother admitted that the Department had been involved with her children due to an allegation of physical abuse regarding one of the sons, but Grandmother claimed that she was the victim and denied that her son's father had physically abused him. At trial, the Department argued that this prior history, coupled with the fact that K.L. was seriously injured while under Grandmother's care, made family reunification too risky.

The jury could also consider the testimony of Mother's and Grandmother's psychiatrist, Dr. Venkatesh, in evaluating whether termination of Mother's parental rights was in K.L.'s best interest. According to Dr. Venkatesh, both Mother and Grandmother have bipolar disorder. Dr. Venkatesh's global assessment of functioning reflects that Mother and Grandmother have an impaired level of functioning. Dr. Venkatesh acknowledged that the primary stressors on Grandmother related to Mother's pattern of running away with boys she met. The jury could have inferred that Grandmother would likely continue to face that type of stress based on Mother's past patterns of behavior.

The jury could also consider K.L.'s progress after her removal from Grandmother's home. According to K.L.'s foster parent, K.L. was thriving in foster care and the foster family expressed the desire to adopt her. The foster mother also indicated that with respect to their plans, she and her husband were open to allowing K.L. to know her parents. Mother argues that the fact that the foster family will provide a more stable home than Mother's family does not justify the jury's decision that terminating Mother's rights is in K.L.'s best interest. Grandmother argues that Mother had not committed an act that

justifies severing Mother's relationship with K.L., but Grandmother's argument erroneously assumes that Mother's June 2010 affidavit was ineffective.

It was undisputed that Mother could not raise K.L. by herself and that K.L. was seriously injured when Grandmother left K.L. in the care of her fourteen-year-old (nearly fifteen-year-old) son. Although there was some evidence that Grandmother's mental state had recently improved, there was also evidence that two months prior to trial Grandmother was "sleeping all day" and that it was "causing problems in her family." Additionally, there was no evidence that Mother's mental illness was, at the time of trial, being treated. Mother was living in Grandmother's household at the time of trial, but considering Mother's past behavior patterns, including Dr. Venkatesh's testimony that at times Mother had posed a danger to K.L., the jury could reasonably have concluded that the living situation would become intolerable to Mother and she would leave. Given the evidence of continuing instability, the evidence of Grandmother's and Mother's plan to jointly raise K.L., and the evidence that Mother had voluntarily relinquished her rights to parent K.L., the jury could reasonably form a firm belief or conviction that termination offered the preferable plan in considering K.L.'s best interest.

Mother argues that the evidence merely shows that the foster family would provide a more stable home than she could. The jury heard testimony that Grandmother was eager to provide a home for K.L., and Grandmother's psychiatrist expressed his opinion that Grandmother could cope with the stress of caring for a child. Given that K.L. was seriously injured while in Grandmother's care and Grandmother's history of Department intervention, as well as their plan to raise K.L. together, the evidence favoring a decision contrary to that

reached by the jury is not so significant that the jury could not reasonably have formed a firm belief or conviction that termination is in K.L.'s best interest. *See J.F.C.*, 96 S.W.3d at 266. We overrule Mother's thirteenth issue and Grandmother's third issue.

Termination of Father's Parental Rights

Mother's fifth, tenth, eleventh and twelfth issues assert errors that relate to the termination of Father's rights. Father's first issue raises the same complaint as raised by Mother's fifth issue. Father's third issue and Mother's issues ten through twelve raise sufficiency challenges to the grounds of termination on which the trial court relied in rendering its judgment. *See* Tex. Fam.Code Ann. § 161.001(1)(D),(N) and (O).

First, we address whether Mother has standing to raise complaints that concern the effect of the judgment on Father. An appealing party cannot complain of errors that do not injuriously affect that party or which merely affect others. *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 150 (Tex.1982). We hold that Mother lacks standing to complain about a violation of Father's due process rights. *See In re T.N.*, 142 S.W.3d 522, 525 (Tex.App.-Fort Worth 2004, no pet.); *In re B.B.*, 971 S.W.2d 160, 163 (Tex.App.-Beaumont 1998, pet. denied), *disapproved on other grounds by In re C.H.*, 89 S.W.3d 17, 25–26 (Tex.2002). In her brief, Mother does not explain how she has been injuriously affected by the trial court's decision to terminate Father's rights. Accordingly, we will not address the merits of Mother's fifth, tenth, eleventh and twelfth issues.

We now turn to the issues Father has raised in his brief. Father's first issue complains about the trial court's failure to appoint an attorney to represent him in the proceedings. Father's second issue

concerns whether he received notice of various permanency hearings and of the trial.

Before addressing Father's issues, we relate the procedural background of the case· that is relevant to Father's issues. The trial court authorized citation to be served on Father by posting, and Father was served by posting on October 13, 2009. On May 3, 2010, Father appeared by filing a document titled "Waiver Of Issuance And Service Of Citation And General Appearance." Father's answer states that his residence is at an address on North Thompson Street in Conroe, or at his mother's permanent address in Point Blank. After Father appeared, the trial court conducted four permanency hearings, one in May 2010, one in June 2010, one in August 2010, and one in October 2010. Father did not appear at any of these hearings.

■ Constructive abandonment is one of the findings the trial court utilized to terminate Father's parental rights. Constructive abandonment is a basis for termination that is separate from the grounds available to terminate Father's rights under the family service plan. Father, ·although aware that K.L. had been placed in the Department's custody, made only one effort to see K.L. during that time. Before we determine if the failure to give Father notice of the permanency hearings caused the trial court to render an improper judgment, we must first determine whether the evidence supports the jury's finding that Father constructively abandoned K.L., as that finding is independent of the findings that are based upon Father's failure to comply with the family service plan. *See* Tex.R.App. P. 44.1(a).

■ Father's third issue argues that the evidence is insufficient to support the trial court's terminating his parental rights on the ground of constructive abandonment. *See* Tex. Fam.Code Ann. § 161.001(1)(N) (allowing the court to order termination due to constructive abandonment). Despite Father's failure to properly raise a sufficiency challenge in the trial court, we will address Father's sufficiency challenge to the constructive abandonment finding to protect Father's right to effective assistance of counsel. *See generally In re J.O.A.*, 283 S.W.3d 336, 343 (Tex.2004); *In re M.S.*, 115 S.W.3d 534, 550 (Tex.2003). While Father's brief raised an insufficiency challenge to the jury's constructive abandonment finding, Father's brief does not argue that the evidence did ̣not support the jury's best interest finding; consequently, our analysis with respect to Father's issues does not reach the best interest finding and is limited to the issue Father has raised in his brief, whether the evidence is sufficient to support the jury's ̣finding of constructive abandonment. *See* Tex. Fam.Code Ann. § 161.001(1)(N).

■ To establish that a child is constructively abandoned, the party seeking the termination must show, by clear and convincing evidence, that (1) the parent constructively abandoned the child who has been in temporary managing conservatorship of the Department for not less than six months; (2) the Department has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. *Id.*

With respect to Father's abandonment while K.L. was in the Department's custody, the evidence admitted during trial showed that shortly after K.L. was taken into custody by the Department, the Department contacted Father, who informed the Department's investigator that "he was

aware that the child existed[, and said that he] was not certain he was the father." According to the investigator, Father was unwilling to come to court, or to submit to DNA testing, and Father asked that the investigator never contact him at that number again. Father's own testimony showed he had no significant contact with K.L. dating back to her birth. According to Father, he had no physical contact with K.L. after she was born. Father attempted to visit K.L. one time after these proceedings commenced, but that effort was unsuccessful. Father admitted he had never supported K.L., although there were periods after the proceedings began that he could have done so, at least in part. Father explained that he never tried to work with the Department because he could not provide K.L. with a place to live. Father also explained that he was currently living with his sister, who was about to lose her apartment, and that as a result of that, as well as other family problems, he had "a lot of stuff going through my head right now[.]" The testimony of a witness from the Department is consistent with Father's testimony that he never attempted to be a part of K.L.'s life while she was in foster care.

In a legal sufficiency review, an appellate court looks "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *See In re J.F.C.*, 96 S.W.3d at 266. In a factual sufficiency review we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* (citation omitted). In this case, the evidence, viewed in a light most favorable to the jury's finding, shows that Father and Mother quit seeing each other before K.L.'s birth even though Father was aware that Mother was pregnant with a child. Father, after learning of

K.L.'s birth, and before these proceedings commenced, made no effort to see K.L. or provide her with any support. Approximately nine months after these proceedings commenced, Father filed a general appearance, waived citation, and admitted that he was K.L.'s father. However, Father testified that he never attempted to make contact with K.L.'s caseworker even though he knew K.L. was in the Department's care, and he only once attempted, without success, to meet with K.L.

From this evidence, the jury could have formed a firm belief or conviction that Father had no intention of parenting K.L., or providing her with any support or a safe place to live. The evidence is legally sufficient to support the jury's finding regarding Father's constructive abandonment of K.L. Giving due consideration to this same evidence, it is also factually sufficient to support the jury's finding that Father constructively abandoned K.L. We overrule Father's argument in issue three asserting that the evidence is insufficient to support the jury's constructive abandonment finding. Because a termination finding supported by one of the statutory grounds for termination is sufficient to affirm the trial court's judgment, we need not reach Father's other arguments challenging whether there is sufficient evidence to support the jury's other finding that justify terminating his parental rights.

### Notice of Trial

In issue two, Father argues that he did not receive notice of the trial, which began on January 18, 2011. Although claiming he did not receive notice of the trial, Father was personally present in the courtroom when jury selection commenced. It appears that Father decided to attend because he had been served with a subpoena by the State, requiring his presence. At the conclusion of the first day of the trial

and outside the presence of the jury, the trial court asked Father to approach the bench. After mentioning that this was the first time Father had physically appeared and noting that Father had not invoked his right to have an attorney appointed, the trial court advised Father that it was too late for the trial court to appoint an attorney for him. At that point, Father had not ever demanded representation.

Father's trial testimony is also not dispositive regarding whether he received constructive notice of the trial. At the time of trial, Father testified that he was living with his sister at an address different from the addresses that he had provided in his answer. Father also testified that Grandmother informed him of the existence of the termination suit, at which point he and Grandmother met with Grandmother's attorney. Father testified that the suit concerned him and that he understood that the object of the suit was to terminate his parental rights. When asked to identify the addresses where he had lived the previous year, the towns that Father indicated he had been living did not include the city Father listed in his answer as the address where he could be served with copies of pleadings. Additionally, the record does not contain any pleading showing that Father notified the court to change his address from the one that he used in his initial appearance. *See* Tex.R. Civ. P. 21a (allowing service of notices and pleadings on a party at that party's last known address).

First, we address whether Father waived his complaint about receiving insufficient notice of the trial. The version of Texas Family Code section 263.405 in effect at the time of judgment required the filing of a statement of points as a prerequisite for the consideration of that issue on appeal, but also allowed the statement of points to be combined with a motion for new trial. *See* Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332, repealed by Act of May 5, 2011, 82nd Leg., R.S., ch. 75, § 5, 2011 Tex. Gen. Laws 348, 349; (current version at Tex. Fam.Code. Ann. § 263.405 (West Supp.2011)). Father did not file a statement of points, but he did file a motion for new trial which complains that the trial court failed to appoint a lawyer to represent him and asserts that he did not receive notice of the trial.

Although Father failed to file a statement of points, we will consider Father's complaint that he did not receive timely notice of the trial setting because he raised that issue in his motion for new trial. We opt to do so because section 263.405 of the Family Code cannot be applied in a manner that would deprive Father of due process. *See In re J.O.A.*, 283 S.W.3d at 343. By considering the issues raised in Father's motion for new trial as a statement of points for appeal, we avoid the due process concerns that are otherwise presented here. *See In re J.L.*, No. 09–10–00170–CV, 2011 WL 662941, at *1 (Tex.App.-Beaumont Feb. 24, 2011, no pet.).

Although we have concluded that Father did not waive his right to appellate review by failing to file a statement of points, we nevertheless conclude that Father waived his complaint regarding lack of notice because he appeared at trial and participated in the proceedings without asking the court to recess them. Father neither filed a motion to continue nor lodged any objection during trial to the proceedings based on his claim of lack of notice. A party who waives citation and chooses to appear waives any error resulting from the trial court's failure to provide proper notice if that party proceeds to trial without moving for a continuance. *In re J.(B.B.)M.*, 955 S.W.2d 405, 407–08 (Tex.

App.-San Antonio 1997, no pet.). Also, nothing in the record reflects that the district clerk of San Jacinto County failed to send Father a notice of the trial setting at the address that is listed in Father's answer.

Father's additional arguments in issue two concern whether he received proper notice of the permanency hearings. However, we need not reach that issue as one of the grounds for termination includes constructive abandonment, a basis that is independent from the jury's findings that relate to the permanency hearings. Tex. R.App. P. 44.1(a)(1). We overrule issue two.

### Appointment of Counsel

In issue one, Father contends that the trial court erred in failing to appoint counsel to represent Father in the proceedings before the trial court. Father argues that the trial court was required to appoint counsel on his behalf because he was served by publication.

■■■ Generally, trial courts are required to appoint an attorney ad litem to represent the interests of a parent served by citation by publication. Tex. Fam. Code. Ann. § 107.013(a)(2) (West Supp. 2011).[4] Father was served by posting, but the means of citation became moot when he filed a personal appearance and waiver of citation. *See Salinas v. Tex. Dep't of Protective and Regulatory Servs.*, No. 03–04–00065–CV, 2004 WL 1896890, at *2 (Tex.App.-Austin Aug. 26, 2004, no pet.) (mem. op.).

Next, Father argues that the trial court should have appointed an attorney to represent him because he was indigent. The Family Code requires that if an indigent parent responds, opposing the request of a governmental entity to terminate a parent-child relationship, the parent is entitled to the appointment of an attorney ad litem. Tex. Fam.Code Ann. § 107.013(a)(1). The provision requiring the trial court to appoint an attorney for indigent parents also requires that a parent claiming indigence must file an affidavit of indigence that complies with Rule 145 of the Texas Rules of Civil Procedure "before the court can conduct a hearing to determine the parent's indigence under this section." Tex. Fam.Code Ann. § 107.013(d); *see* Tex.R. Civ. P. 145. Father first signed an affidavit claiming indigence in February 2011, although it does not appear that his affidavit was filed with the district clerk until March 4, 2011. By then, the trial was over and the jury had returned its verdict. On appeal, Father argues that the trial court erred in failing to appoint counsel at an earlier point in the proceedings.

In his argument, Father relies on a case in which the trial court erroneously denied a parent's application for appointment of counsel and consequently erred by failing to appoint counsel prior to accepting a parent's affidavit of relinquishment. *See In re C.D.S.*, 172 S.W.3d 179, 182, 185 (Tex.App.-Fort Worth 2005, no pet.). In *C.D.S.*, the indigent parent requested an attorney and the trial court erred in adjudicating the case without providing an attorney. In this case, the trial court promptly appointed an attorney when Father requested one, but the trial court did not have notice of Father's claim of indigence prior to trial. We conclude that *C.D.S.* is distinguished by these facts.

■■■ On this record, we conclude that Father did not timely raise his claim of

---

4. We cite to the current version of section 107.013 because the 2011 amendment does

not affect the outcome of this appeal.

indigence before filing an affidavit of indigence, and when he filed that affidavit, the trial court promptly appointed counsel for him. *See* Tex. Fam.Code Ann. § 107.013(d). Under the circumstances, Father has not shown that the trial court abused its discretion by failing to appoint an attorney to represent him at an earlier date. We overrule Father's first issue.

### Conservatorship

■■■■ Grandmother's fourth issue challenges the legal and factual sufficiency of the evidence supporting the jury's finding that the Department should be appointed as K.L.'s sole managing conservator.[5] Termination and conservatorship are distinct issues. *In re J.A.J.*, 243 S.W.3d 611, 617 (Tex.2007). A preponderance of the evidence standard applies to conservatorship issues. *Id.* at 616. In a legal sufficiency review, "a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. A factual sufficiency review is only slightly less deferential to the factfinder, as under that standard "a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* Under a factual sufficiency standard, the findings are sufficient unless, based on the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have

formed a firm belief or conviction[ ]" that the fact at issue was true. *Id.*

In determining that the Department's appointment was in K.L.'s best interest, the jury was entitled to consider that Mother signed an irrevocable affidavit of relinquishment that designated the Department to serve as managing conservator. By statute, the Department must be designated as managing conservator unless that appointment would not be in the best interest of the child. Tex. Fam. Code Ann. § 153.374 (West 2008). Although Grandmother desired appointment either as K.L.'s possessory or managing conservator, the evidence in the record reflects that Grandmother had a significant disability due to mental illness. The jury had evidence that Grandmother's mental illness had, at times, caused her to have homicidal thoughts. The jury also had evidence that Grandmother, at times, had smoked marijuana. The record also contains evidence from which the jury could reasonably conclude that Grandmother's failure to adequately supervise K.L. had contributed to causing her accident. Additionally, with respect to Grandmother's request for possessory rights, the Department ruled out placing K.L. with Grandmother in part because it was on notice of a prior incident in which Grandmother had not adequately protected another child in her custody from another adult. Moreover, Grandmother's plans for K.L. contemplated Mother's assistance, and there was evidence that Mother's psychiatrist, at times, felt that

---

5. Mother's fourteenth and fifteenth issues challenge the factual sufficiency of the jury's findings that the Department, not Grandmother, should be named to be K.L.'s sole managing conservator. The Department contends that, since Mother's parental rights were terminated, she is without standing with respect to her ability to raise a factual sufficiency challenge concerning who was ap-

pointed K.L.'s managing conservator. Because we have reviewed all the evidence in resolving Grandmother's challenge, and in light of our resolution of Grandmother's challenge to the conservatorship finding, we need not resolve Mother's challenge to these findings, as her challenge raises no arguments not addressed by our resolution of Grandmother's issue. *See* Tex.R.App. P. 47.1.

Mother could endanger K.L. Finally, while the record includes testimony supporting Grandmother's claim that she could adequately care for K.L., K.L.'s court appointed special advocate testified that, in her opinion, it was in K.L.'s best interest to have the parental rights of her parents terminated and to have the Department named as K.L.'s managing conservator.

Whether Grandmother could adequately care for K.L. was a contested issue; because the evidence raised fact issues for the jury, we conclude that the evidence does not establish, as a matter of law, that the appointment of the Department as K.L.'s conservator was not in K.L.'s best interest. Nor does the evidence supporting an inference that the Department's appointment as K.L.'s conservator was not in K.L.'s best interest outweigh the evidence to the contrary. Instead, the record contains evidence showing that the Department could provide K.L. with a safe home where she would receive adequate care, and evidence from which the jury could reasonably conclude that Grandmother, even assisted by Mother, could not. The jury was entitled to weigh choosing the Department, with its plan for adoption, against choosing a home in which the plans for K.L. included the assistance of a parent who had signed an affidavit relinquishing her parental rights. Having considered all the evidence, we hold that the evidence was sufficient to allow the jury to reasonably conclude that K.L.'s best interest would be served by making the Department K.L.'s sole managing conservator. Viewing the evidence as a whole, we conclude that the jury's finding that appointing Grandmother as K.L.'s possessory conservator was not in K.L.'s best interest is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Having carefully reviewed all of the favorable and unfavorable evidence regarding the jury's finding that Grandmother's appointment as K.L.'s possessory conservator was not in K.L.'s best interest, we conclude the evidence is sufficient to support it and overrule Grandmother's fourth issue. Because we have concluded that none of the issues that have been raised by Mother, Father, or Grandmother require that we reverse the jury's verdict, we affirm the trial court's judgment.

AFFIRMED.

DAVID GAULTNEY, Justice, dissenting.

A county court found that the mother is totally incapacitated because of a mental deficiency (which the county court judge described as "mental retardation and bipolar disorder"), and the county court appointed a guardian over the mother's person and estate. The county court found that the mother's impaired judgment and abilities were "evidenced by recurrent acts showing lack of self-care and ability to manage her own person and financial affairs without full-time institutional care and assistance for a period of 6 months prior to this order," and that this "condition is not established by mere isolated instances of negligence or bad judgment." The Department's examining psychologist reported seven months earlier that the mother could read only at a second grade level. He was unable to perform two tests because of her "low reading levels."

The legal effect of the county court's order is an issue of law. The jury was not entitled to give that court order whatever little weight the jury deemed appropriate. When the relinquishment affidavit was offered into evidence, the mother and the grandmother objected that there had been "no showing that [the mother] was competent" when the affidavit was signed, and

"no showing that she had a guardian to advise her" at that time. That objection should have been sustained. Given the lack of legally sufficient evidence that her mental capacity was different two months before the county court's guardianship order was signed, the jury's finding—that the relinquishment affidavit was "knowingly and intelligently" executed two months earlier—conflicts with the county court's findings and should be set aside. The Family Code provides a ground for involuntary termination when a mental deficiency renders a parent unable to provide for the needs of a child.[1] The Department did not pursue that ground. The grounds the Department did assert against the mother are not supported by clear and convincing evidence.

The father did not receive proper notices, and counsel was not appointed to represent him. When he filed his answer, the Department was provided with addresses to notify him, and with knowledge that he was not represented by counsel. The answer he filed stated that the attorney who helped him prepare the pleading did not represent him. The trial court made specific findings that the father was not notified of hearings held before trial. The father testified he received no notice in the mail. The father was entitled to appointed counsel and to proper notice of the trial. He had no counsel. Under the circumstances, the Department should have alerted the trial court to the need to appoint counsel for the father, and of the lack of proper notice of trial. Instead, the Department served the father with a subpoena to appear at trial and, not surprisingly, the father appeared without counsel.

The grandmother's claim is dependent on the result of the Department's case against the parents. We should reverse the judgment and remand the case for proceedings that comply with due process and the Family Code.

---

1. *See* Tex. Fam.Code Ann. § 161.003 (West 2008).