# IN THE SUPREME COURT OF TEXAS

════════════

No. 12-0728

════════════

IN THE INTEREST OF K.M.L., A CHILD

════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS

════════════════════════════════════════════════════════

**Argued June 24, 2013**

JUSTICE GREEN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE WILLETT, JUSTICE GUZMAN, and JUSTICE BROWN joined, and in which JUSTICE JOHNSON and JUSTICE BOYD joined except as to Parts II.B, II.D, and IV, and in which JUSTICE LEHRMANN and JUSTICE DEVINE joined except as to Parts III and IV.

JUSTICE LEHRMANN filed a concurring opinion, in which JUSTICE DEVINE joined.

JUSTICE JOHNSON filed an opinion dissenting in part, in which JUSTICE BOYD joined.

In this parental termination case, we consider whether the trial court properly terminated the parental rights of an intellectually disabled and mentally ill mother who executed a voluntary affidavit of relinquishment and the parental rights of an indigent father who was not appointed trial counsel nor provided notice of the trial. Following a jury trial, the trial court signed a judgment terminating both the mother's and the father's parental rights to their minor child, and appointed the Texas Department of Family and Protective Services (DFPS) as the child's sole managing conservator. The court of appeals affirmed both terminations. ___ S.W.3d ___, ___ (Tex. App.—Beaumont 2012, pet. granted) (mem. op.). Because there is legally insufficient evidence that

the mother knowingly and intelligently executed the affidavit of voluntary relinquishment, and because the father did not receive notice of trial and did not waive notice, we reverse the judgment of the court of appeals and hold that termination of both parents' rights was improper.

## I. Factual and Procedural Background

Just days after her eighteenth birthday, high-school student Melissa gave birth to a daughter, K.M.L., in Tennessee. The baby's father, John, seventeen at the time, lived in Texas. During the pregnancy, Melissa, her two younger brothers, and her mother, Angali, moved from Texas to Tennessee. Melissa suffers from bipolar disorder and has intellectual disabilities, and she and her mother have had a tumultuous relationship. Angali and Melissa decided that Melissa should move back to Texas to live with her uncle to finish high school, leaving K.M.L. with Angali. Over the next two years, Melissa graduated high school, visiting her daughter occasionally, and shuffled from one friend's house to the next. Angali served as K.M.L.'s primary caretaker, a position Melissa never questioned. John knew about K.M.L., but never made any attempts to see her or support her during this period.

Sometime before K.M.L.'s second birthday, Angali and Melissa consulted an attorney in Texas about making K.M.L.'s living situation permanent. Under that attorney's guidance, the women executed a "Guardianship" letter, whereby Melissa believed she had empowered Angali to manage the finances, health, and psychiatric and psychological care of K.M.L., and to make educational decisions on K.M.L.'s behalf, though it's undisputed that this document had no legal effect or power. In March and May of 2010 Melissa would again attempt to execute legal documents

2

that were supposed to give Angali parental rights to K.M.L. Much like the "Guardianship" letter, these later attempts were also legally ineffective at providing Angali with parental rights to K.M.L.

Shortly after execution of the "Guardianship" letter, Angali, her two teenaged sons, and K.M.L. moved to Lake Livingston, Texas, temporarily living in a loft apartment. The inside stairs in the apartment did not have railings yet, though the apartment manager had agreed to install them. On August 6, 2009, left alone with her teenaged uncles, two-year-old K.M.L. fell off the stairs. As a result of the six-foot fall, she suffered injuries to her teeth and jaw, though none life-threatening. The very next day, DFPS removed K.M.L. from the home, placed her in foster care, and filed a petition to terminate Melissa's parental rights.

More than two months after suit was filed, DFPS served John by publication, without appointing an attorney ad litem. Over the next six months, John received no notice of the proceedings, nor did he have any involvement with K.M.L. After Angali contacted John and put him in touch with her attorney, John filed pro se pleadings on May 3, 2010, acknowledging paternity, requesting that his rights not be terminated, and providing his sister's address and phone number, where he was currently residing, along with his mother's contact information. Despite filing a response in opposition, John was not provided notice of any hearings in the case, nor is there evidence that he received notice of the trial. John continued to make little effort to see his daughter, even after opposing the termination.

On June 4, 2010, long after proceedings in the termination suit began, Melissa executed an affidavit of voluntary relinquishment naming DFPS as managing conservator of K.M.L., though she allegedly believed that the document enabled Angali to obtain legal custody of K.M.L. and adopt

K.M.L. About six weeks later, as a result of Melissa's disabilities, the County Court of San Jacinto County signed a guardianship order naming Angali as Melissa's guardian of the person and estate. Melissa, through a replacement attorney ad litem and through her mother as guardian, made multiple attempts to strike the affidavit of relinquishment from the case, including a "Motion for Revocation" and a "Special Exception," both denied and overruled, and then a "First Supplemental Original Answer" and a "Second Supplemental Answer," raising an affirmative defense that the relinquishment affidavit was illegal.

On January 18, 2011, the first day of trial, the State served John with a subpoena to attend the trial, and John arrived by police escort. For the first hours of the trial, John sat in the hall outside the courtroom and missed pre-trial motions, jury selection, and part of DFPS's opening statement. Angali's attorney alerted the trial court to the fact that John was in the hallway halfway through DFPS's opening statement, and John came into the courtroom. The trial judge told John—after John gave a short opening statement—that he possibly could have been entitled to appointed counsel, but that it was "a little late for that now."[1] During trial, the jury heard testimony from, among others,

---

[1] The exchange between the trial court and John proceeded as follows:

| The Court: | . . . You are in the case. You are representing yourself. I would say that in all likelihood if you had ever made any type of appearance before this court, that if you didn't have a job and didn't represent yourself - - or didn't - - weren't able to hire an attorney, you would be entitled to have an attorney appointed for you. It's a little late for that now. No attorney could prepare for representing you in the midst of a trial. |
|---|---|
| John: | Yes, sir. |
| The Court: | So, I assume you still want to participate, but you are going to have to probably make a better showing than you have made up until now, and you are going to have to operate within the rules. Just because you are not an attorney, it does not mean that you get to go outside the rules that the attorneys have to follow. Do you understand? |
| John: | Yes, sir. |

Melissa, Angali, and John, along with testimony from Melissa's original attorney, a DFPS special investigator, K.M.L.'s DFPS conservatorship supervisor, K.M.L.'s CASA volunteer,[2] and Melissa and Angali's psychiatrist.

Following a four-day trial, the jury found that termination of Melissa and John's parental rights was in K.M.L.'s best interest. Additionally, the jury found termination grounds for Melissa based on endangerment (Family Code section 161.001(1)(D) and (E)), voluntary relinquishment (section 161.001(1)(K)), and failure to follow a court-ordered reunification plan (section 161.001(1)(O)).[3] The jury terminated John's rights based on endangerment (section 161.001(1)(D)), failure to follow a court-ordered reunification plan (section 161.001(1)(O)), and constructive abandonment (section 161.001(1)(N)). Finally, the jury found that DFPS, not Angali, should be appointed the sole managing conservator of K.M.L. The trial court ordered the termination of both Melissa and John's parental rights and appointed DFPS as K.M.L.'s sole managing conservator.

Melissa and Angali challenged the sufficiency of the evidence to support all four statutory grounds for termination of Melissa's rights in the court of appeals. ___ S.W.3d, at ___. The court of appeals acknowledged that there is conflicting evidence on the issue of whether Melissa executed

---

> The Court: Okay. . . . I didn't know you were in the hallway. [Angali's attorney] knew it because he saw you. But if you don't have the understanding and the gumption to come walking in on your own, we're not going to be going out looking for you anymore. Do you understand that?
>
> John: Yes, sir.

[2] A CASA volunteer, or Texas Court Appointed Special Advocate, can be appointed to serve as guardian ad litem or a volunteer advocate for the child under Family Code section 107.031 in termination suits. TEX. FAM. CODE § 107.031; TEXAS CASA, INC., http://www.texascasa.org (last visited Aug. 27, 2014).

[3] We note that Family Code section 161.003 provides for involuntary termination of parental rights when a parent is unable to provide for the needs of the child due to mental or emotional illness or a mental deficiency. *See* TEX. FAM. CODE § 161.003(a)(1). There is no explanation for why DFPS did not pursue termination under this statutory provision.

5

the affidavit voluntarily, but it treated the guardianship order as merely some evidence relevant to that issue and reasoned that the jury was entitled to give the order little weight. *See id*. at ___. Because termination could be affirmed under subsection (K)—voluntary relinquishment—the court of appeals did not address the other grounds. *See id.* at ___. The court of appeals held that the jury verdict for John's constructive abandonment is supported by legally sufficient evidence and did not address John's legal and factual sufficiency challenges to the other grounds for termination. *See id.* at ___. Additionally, the court of appeals held that John waived his complaint about notice of trial by appearing at trial and did not address the lack of notice of the permanency hearings. *See id.* at ___. Finally, the court of appeals held that John waived his right to counsel under Family Code section 107.013 because he generally appeared following service by publication and did not request an attorney or file an affidavit of indigence until after trial. *See id.* at ___. All three parties—Melissa, Angali, and John—filed petitions for review in this Court, which we granted. 56 Tex. Sup. Ct. J. 519, 522 (May 3, 2013).

## II. Melissa and Angali's Issues

Melissa, individually, and Angali, individually as intervenor and on Melissa's behalf as her guardian, filed separate petitions for review.[4] Taking the two petitions collectively, Melissa and Angali raise three distinct issues: (1) whether the trial court improperly admitted Melissa's June 4

---

[4] While Family Code section 102.004(a) grants grandparents standing to file suit requesting managing conservatorship and section 153.432 grants grandparents standing to request possession of or access to a grandchild, for a grandparent to raise issues related to a terminated parent's rights, the intervening grandparent must satisfy the requirements of Rule 60 of the Texas Rules of Civil Procedure—that is, the grandparent must have a justiciable interest in the pending suit. TEX. R. CIV. P. 60; *see In re Union Carbide Corp.*, 273 S.W.3d 152, 154–55 (Tex. 2008) (citing *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990)); *see also In re H.M.J.H.*, 209 S.W.3d 320, 322 (Tex. App.—Dallas 2006, no pet.). Because Angali was appointed Melissa's guardian by a probate court on July 26, 2010, and because Angali's rights to serve as possessory conservator were also adjudicated in the trial court below, we agree with the court of appeals that Angali's interest rises to the level of being justiciable, and we will address the issues she has raised. *See* ___ S.W.3d at ___ n.2.

6

affidavit of voluntary relinquishment of parental rights; (2) whether the jury's finding that Melissa knowingly and intelligently executed the affidavit of voluntary relinquishment is supported by legally sufficient evidence, and (3) whether the jury's finding that the termination of Melissa's parental rights was in the child's best interest is supported by legally sufficient evidence.

**A. Admissibility of June 4 Affidavit**

While a "parental rights termination proceeding encumbers a value 'far more precious than any property right,'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982)), this right may be waived through statutes such as Texas Family Code section 161.103, which provides for affidavits of voluntary relinquishment of parental rights. *See, e.g.*, *In re L.M.I.*, 119 S.W.3d 707, 721–22 (Tex. 2003) (Owen, J., concurring and dissenting). In this case, the trial court terminated Melissa's parental rights upon a jury finding that Melissa knowingly and intelligently executed an affidavit of voluntary relinquishment of her parental rights, among other grounds for termination. However, Melissa argues that the June 4 affidavit of voluntary relinquishment is inadmissible. First, she argues that this affidavit is facially deficient and inadmissible because it did not include a verification, as required by Family Code section 161.103(a)(3). Second, she argues that the probate court guardianship determination made two months after the affidavit was executed negates the prima facia showing that the affidavit was executed voluntarily and knowingly and, thus, that DFPS did not meet its evidentiary burden with regard to the affidavit. Finally, she argues that the affidavit is not valid because Melissa did not execute the affidavit through a guardian, which was necessary as she was not competent to execute the affidavit without a guardian present.

7

## 1. Statutory Formalities

Under the Family Code, a trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that termination is in the best interest of the child and that the parent has executed a valid, irrevocable affidavit of relinquishment of parental rights. *See* TEX. FAM. CODE § 161.001(1)(K), (2). Section 161.103 of the Family Code provides a litany of requirements that must be met for the affidavit of voluntary relinquishment of parental rights to form the basis for termination of the parent-child relationship under section 161.001(1)(K). *See generally id.* § 161.103. Notably, the affidavit must be witnessed by two credible persons and verified before a person authorized to take oaths. *Id.* § 161.103(a). Melissa argues that her affidavit of voluntary relinquishment is deficient because it does not include a verification—that is, it does not include a statement by Melissa that she swears to the truth of the document's contents. Melissa points out that the relinquishment affidavit form promulgated by the Family Law Section of the State Bar of Texas includes such language, while the DFPS of San Jacinto County, Texas, used a form that does not include such language. DFPS, on the other hand, argues that a verification is not required because the requirement that the affidavit be "verified" is different from a requirement that it include a "verification." Alternatively, DFPS argues that the affidavit was verified, as the affidavit stated, "Melissa . . . , known to me to be the person whose signature appears below, appeared in person before me and being by me duly sworn, in the presence of the undersigned credible witnesses, stated under oath . . . ."

Texas Government Code section 312.011 defines "affidavit" as "a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office." TEX. GOV'T CODE § 312.011(1).

Additionally, section 312.011 defines "swear" or "sworn" to include "affirm," and defines "oath" to include "affirmation." *Id.* § 312.011(8), (16). However, section 312.011 does not define "verify"—the key word at the center of this dispute. *See generally id.* § 312.011. Black's Law Dictionary defines "verification" as "(1) [a] formal declaration made in the presence of an authorized officer, such as a notary public . . . ; whereby one swears to the truth of the statements in the document [or]; (2) [a]n oath or affirmation that an authorized officer administers to an affiant or deponent." BLACK'S LAW DICTIONARY 1793 (10th ed. 2009). Black's also provides a separate definition for "verify" as "(1) [t]o prove to be true; to confirm or establish the truth or truthfulness of; to authenticate; [or] (2) [t]o confirm or substantiate by oath or affidavit; to swear to the truth of." *Id.*

DFPS attempts to draw a meaningful distinction between these two terms, arguing that the Family Code requires only that the affidavit be verified (substantiated by oath or affidavit) and does not require a verification (a formal declaration by which one swears to the truth of the statements in the document). However, this is a distinction without difference. Many of our rules of procedure require court documents to be "verified," without using the noun form of the word—"verification." *See, e.g.*, TEX. R. CIV. P. 93, 165a, 680, 682. Even the Legislature interchanges the terminology elsewhere in the Family Code. For instance, section 31.002, providing for suit for removal of disabilities of minority, is captioned "Requisites of Petition; Verification," yet the text uses "verify" and "verified." TEX. FAM. CODE § 31.002(b). Any difference between "verified" and "verification" is merely a matter of semantics. Family Code section 161.103(a)(3) clearly states that the affidavit for voluntary relinquishment of parental rights must be "verified before a person authorized to take oaths." TEX. FAM. CODE § 161.103(a)(3). As we interpret statutes with the fair assumption that the

9

Legislature intends the words it chooses, *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 886 (Tex. 1999), applying the words as they are written, *Lee v. City of Houst.*, 807 S.W.2d 290, 293 (Tex. 1991), we must determine whether the affidavit here was verified—that is, whether it included a verification.

Melissa argues that the language in the affidavit that the statements are made "under oath" cannot constitute a verification, because an affidavit, by definition, is a statement made under oath, citing Government Code section 312.011(1). Melissa's argument fails, however, because the plain language of section 312.011(1) does not state, as she argues, that an "affidavit" is a statement made "under oath." *See* TEX. GOV'T CODE § 312.011(1). Section 312.011(1) defines affidavit as a statement "sworn to before an officer authorized to administer oaths." *Id.* "Under oath" connotes more than simply "sworn to," as Black's Law Dictionary notes that "[t]he person making the oath implicitly invites punishment if the statement is untrue or the promise [to tell the truth] is broken." BLACK'S LAW DICTIONARY 1239 (10th ed. 2009).

While we have not addressed this issue in the context of relinquishment of parental rights, and nor have any of our courts of appeals, we can turn for guidance to case law interpreting other statutes and rules of procedure requiring court documents to be verified. Noticeably absent from this Court's case law, however, is a definition of "verified." For example, we have considered documents under Rule 165a(3) of the Texas Rules of Civil Procedure, which provides that a case dismissed for want of prosecution shall be reinstated if a motion to reinstate, which sets forth the grounds for reinstatement and is *verified* by the movant or his attorney, is filed with the clerk within

10

thirty days of dismissal.[9]  In addressing Rule 165, we have either simply stated that the party filed an unverified motion or held that the motion, supported by an affidavit from counsel, was, in fact, verified.  *Compare McConnell v. May*, 800 S.W.2d 194, 194 (Tex. 1990) (per curiam), *and Butts v. Capitol City Nursing Home, Inc.*, 705 S.W.2d 696, 697 (Tex. 1986) (per curiam) (stating that the motion was unverified), *with Ginn v. Forrester*, 282 S.W.3d 430, 431 (Tex. 2009) (per curiam) (stating that the party filed a "verified motion to retain the case," without analysis), *Guest v. Dixon*, 195 S.W.3d 687, 688–89 (Tex. 2006) (per curiam) (holding that a motion to reinstate was properly verified because it was supported by the attorney's affidavit), *and Thordson v. City of Houst.*, 815 S.W.2d 550, 550 (Tex. 1991) (per curiam) (stating that the motion to reinstate was verified and properly filed under Rule 165a(3)).

Several courts of appeals have attempted to delineate the verification requirement in both the Rule 165a context and the Rule 93 context, which requires certain pleas in an answer to be verified. *See* TEX. R. CIV. P. 93.  The courts that have addressed the issue have held that no particular form of verification is required so long as the affiant swears to the truth of the contents and that the affidavit is based on personal knowledge.  *See, e.g.*, *Andrews v. Stanton*, 198 S.W.3d 4, 7–8 (Tex. App.—El Paso 2006, no pet.); *Cantu v. Holiday Inns, Inc.*, 910 S.W.2d 113, 116 (Tex. App.—Corpus Christi 1995, no pet.); *Brown Found. Repair & Consulting, Inc. v. Friendly Chevrolet Co.*, 715 S.W.2d 115, 117 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *Durret v. Boger*, 234 S.W.2d 898, 900 (Tex. Civ. App.—Texarkana 1950, no writ).

---

[9] Other examples of the term "verified" in the rules of procedure include Rule 18a (providing that a motion to recuse or disqualify a judge be verified), Rule 107 (providing that the return of service or attempt of service of a citation by a person other than a sheriff, constable, or clerk be verified or signed under penalty of perjury), Rule 680 (providing for a temporary restraining order by an affidavit or verified complaint), Rule 682 (requiring a petition for writ of injunction to be verified by an affidavit), and Rule 690 (providing that an injunction may only be dissolved before final hearing if the respondent denies the allegations of the petition in a verified answer).

Melissa relies heavily on *Brown Foundation Repair & Consulting, Inc. v. Friendly Chevrolet Co.*, which expressly held that an affidavit was not verified, as required under Rule 93. *See* 715 S.W.2d at 117. The jurat—the signature and proclamation of the notary—in *Brown* was similar to Melissa's affidavit, but contained one significant difference. *See id.* The *Brown* affidavit, after being signed by the affiant, stated, "SUBSCRIBED AND SWORN TO before me, the undersigned authority, by [affiant], known to me to be the Vice-President of Brown Foundation Repair and Consulting, Inc., to certify which witness my hand and seal of office this 28 day of June, 1985." *Id.* The court concluded that the affidavit was insufficient under Rule 93 because the affiant did not swear or affirm under oath that the facts stated were true, but simply "swore to" to facts. *Id.* at 117–18. Merely because it is stated that the affiant has subscribed and sworn to a document does not constitute the affiant swearing or affirming under oath that the facts stated are true. *Id.* at 118. The affidavit here, however, did include a jurat indicating that Melissa made the statements "under oath," distinguishing this affidavit from the one in *Brown*.

Melissa also relies on two rules of procedure which have been construed to require specific verifications, despite not using the term "verification" in the text of the rule. For instance, Rule 185 regarding suits on sworn accounts—one of the most commonly used rules of procedure requiring verified pleadings and verified denials—does not use the term verified or verification in its text. *See* TEX. R. CIV. P. 185. Rather, it requires that the pleadings be "supported by the affidavit of the party, his agent or attorney taken before some officer authorized to administer oaths, to the effect that such claim is, within the knowledge of the affiant, just and true." *Id.* Additionally, Rule 166a, the procedure for summary judgments, permits the submission of evidence by affidavit, but requires that such affidavits "shall be made on personal knowledge, shall set forth such facts as would be

12

admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein," never using the term "verify" explicitly. Tex. R. Civ. P. 166a(f). Neither of these rules are analogous to Family Code section 161.103(a)(3) because both rules expressly require language in the affidavit that the information is "within the knowledge of the affiant, just and true" (Rule 185) or that the affidavit is "made on personal knowledge" (Rule 166a).

The affidavit here is verified—Melissa swore, under oath, to the contents of the affidavit. If "verify" means to "substantiate by oath or affidavit," Black's Law Dictionary 1793 (10th ed. 2009), and "verification" is "an oath or affirmation that an authorized officer administers to an affiant or deponent," *id.*, surely Melissa's signature on the affidavit where the notary stated, "Melissa . . . , known to me to be the person whose signature appears below, appeared in person before me and being by me *duly sworn*, in the presence of the undersigned credible witnesses, stated *under oath*," (emphasis added), and later, in the jurat, stated, "Signed *under oath* before me in the presence of the above witnesses on this the 4th day of June, 2010," (emphasis added), constitutes a verification. We overrule Melissa's first challenge to the admissibility of the affidavit and hold that the affidavit was verified.

### 2. Guardianship Determination

Melissa next argues that the affidavit was inadmissible because the guardianship determination effectively nullified the affidavit. However, this argument fails, as the guardianship determination was made *after* Melissa executed the affidavit. An adjudication of incapacity in a guardianship proceeding fixes the individual's status as an incapacitated person *at that time*. *See, e.g.*, *Evans v. Allen*, 358 S.W.3d 358, 368 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Kokes v. College*, 148 S.W.3d 384, 389 (Tex. App.—Beaumont 2004, no pet.); *Quada v. Quada*, 396

S.W.2d 232, 233 (Tex. App.—Texarkana 1965, no writ). Further, this determination is merely a rebuttable presumption that the legal incapacity will be that person's condition at any given time thereafter in the absence of facts showing reason has been restored. *See Quada*, 393 S.W.2d at 233. There is no legal authority for the proposition that a guardianship determination has retroactive effect such as to conclusively establish Melissa's incapacity to knowingly and intelligently execute the affidavit of voluntary relinquishment on June 4, 2010, and we refuse to hold so here. Accordingly, while the guardianship determination made after Melissa executed the affidavit may be evidence of her mental capacity at the time she executed the affidavit, we hold that the guardianship determination did not render the affidavit inadmissable, and we overrule Melissa's second argument.

### 3. Lack of Guardian Present

Finally, Melissa argues that, because she lacked mental capacity at the time the affidavit was executed, the affidavit needed to have been executed through her guardian to have legal effect. However, this argument also fails because the adjudication that she lacked capacity occurred after she executed the affidavit, not before. As we held above that the guardianship determination has no binding legal impact on the earlier execution of the affidavit, we cannot hold that her guardian (which did not yet exist at the time) was required to execute the affidavit. We overrule Melissa's third argument. Therefore, the trial court did not err in admitting the June 4 affidavit of voluntary relinquishment into evidence. Whether the jury's finding that Melissa knowingly and intelligently executed the affidavit of voluntary relinquishment is supported by legally sufficient evidence is a separate question that we now address.

14

**B. Legal Sufficiency Challenge to Termination Under Subsection (K)**

Melissa challenges the legal sufficiency of the evidence to support termination under subsection (K)—voluntary relinquishment of parental rights. Because the natural right between a parent and his child is one of constitutional dimensions, *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985), termination proceedings must be strictly scrutinized. *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980). In parental termination cases, due process requires application of the clear and convincing standard of proof. *Santosky*, 455 U.S. at 769; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). The Texas Family Code defines clear and convincing as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. Our traditional legal sufficiency—or "no evidence"—standard of review upholds a finding supported by "[a]nything more than a scintilla of evidence." *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). However, "[r]equiring only anything more than a mere scintilla of evidence does not equate to clear and convincing evidence." *In re J.F.C.*, 96 S.W.3d at 265 (internal quotations omitted); *see also Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 621–22 (Tex. 2004). Thus, our legal sufficiency review in a parental termination case must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *In re J.F.C.*, 96 S.W.3d at 265–66.

In a legal sufficiency challenge, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). However,

15

the reviewing court should not disregard undisputed facts that do not support the verdict to determine whether there is clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d at 266. In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *Garza*, 164 S.W.3d at 621. If the reviewing court determines that no reasonable factfinder could form a firm belief or conviction that the matter to be proven is true, then the court must conclude that the evidence is legally insufficient. *In re J.F.C.*, 96 S.W.3d at 266.

Family Code section 161.001(1)(K) permits a trial court to terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has executed an unrevoked or irrevocable affidavit of relinquishment of parental rights. TEX. FAM. CODE § 161.001(1)(K). The petitioner—here, DFPS—has the burden to prove the elements necessary to support termination of the parent-child relationship. *E.g.*, *Djeto v. Tex. Dep't of Protective & Regulatory Servs.*, 928 S.W.2d 96, 97 (Tex. App.—San Antonio 1996, no writ). Section 161.103 requires that the affidavit be for *voluntary* relinquishment, TEX. FAM. CODE § 161.103(a), and implicit in section 161.001(1)(K) is the requirement that the affidavit of parental rights be voluntarily executed. *E.g.*, *Monroe v. Alts. in Motion*, 234 S.W.3d 56, 61–62 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Williams v. Williams*, 150 S.W.3d 436, 447 (Tex. App.—Austin 2004, pet. denied); *Neal v. Tex. Dep't of Human Servs.*, 814 S.W.2d 216, 218 (Tex. App.—San Antonio 1991, writ denied). An involuntarily executed affidavit is a complete defense to a termination suit based on section 161.001(1)(K). *In re A.G.C.*, 279 S.W.3d 441, 449 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Monroe*, 234 S.W.3d at 62; *Neal*, 814 S.W.2d at 219. Here, the jury was specifically asked if it found "by clear and convincing evidence that [Melissa] *knowingly and intelligently* executed after

16

this suit was filed an unrevoked or irrevocable affidavit of relinquishment." (Emphasis added). DFPS did not object to this language in the jury charge, so we measure the sufficiency of the evidence against that language. *See Jackson v. Axelrad*, 221 S.W.3d 650, 657 (Tex. 2007). Therefore, we must determine whether the evidence at trial would cause a reasonable juror to have formed a firm belief or conviction that Melissa voluntarily—that is, knowingly and intelligently—executed the June 4 affidavit. *See In re J.F.C.*, 96 S.W.3d at 266.

Melissa's psychiatrist testified at trial that there was "no way [Melissa] had the mental ability to understand the documents she had signed relative to" terminating her rights, that she suffered from bipolar disorder and borderline intellectual functioning, and that, at Melissa's visit a few weeks after signing the affidavit, she was not regularly taking her medication. He testified that, at her visits in June 2010, Melissa was in need of a guardian to ensure her compliance with treatment. Further, less than two months after Melissa executed the June 4 affidavit, a San Jacinto County Court judge determined that, as a matter of law, Melissa could not manage her own affairs as a result of her severe bipolar disorder. While Melissa did graduate high school, there was uncontroverted testimony that she read at a second-grade reading level. The evidence was also uncontroverted that her IQ was below 70 and she had been diagnosed as borderline intellectual functioning. Her DFPS-appointed counselor testified that someone with an IQ like Melissa's would struggle with the ability to comprehend or understand at times what she is doing. Her psychiatrist stated in his assessment letter in the guardianship proceedings that Melissa did not have full mental and intellectual capacity to be able to properly consider, weigh, and evaluate the factors involved to voluntarily agree to terminate her parental rights.

On the other hand, her DFPS-appointed counselor testified that she and Melissa discussed relinquishing parental rights and that Melissa "seemed to have a good grasp on that" and "didn't seem to be confused." She agreed, however, that Melissa never "got settled, rooted with the idea that she would never see her daughter again." The counselor testified about the careful approach she took to ensure Melissa understood the relinquishment issue by avoiding words that were "too big" and instead using words she knew Melissa could understand. The counselor and Melissa also developed a rapport over time where the counselor made sure Melissa felt comfortable stopping the discussions when she did not understand issues so that the counselor could reword and tailor the conversation to Melissa's comprehension level. In stark contrast, the counselor testified that during the hearing when Melissa executed the affidavit, Melissa "couldn't hear some of what was going on and she had a hard time following the court proceedings . . . as far as the words she didn't understand."

Other testimony underscored Melissa's confusion about the June 4 affidavit. Angali's attorney testified that on two prior occasions, Melissa attempted to execute legal documents that would transfer legal rights over K.M.L. to Angali. Due to the attorney's misunderstanding of the law, both documents had no legal effect, but the attorney testified about Melissa's earnest desire to enable her mother to help care for K.M.L. while Melissa remained part of the child's life. Despite being represented by her own counsel, Melissa attempted to execute those documents without consulting him. When her attorney was present on June 4, Melissa testified that he did not go over the relinquishment affidavit with her. She confided to her DFPS-appointed counselor that her attorney pressured her into signing the relinquishment affidavit instead. Melissa also conveyed to her counselor that the circumstances surrounding the hearing were confusing, and the counselor agreed that events were becoming convoluted to the point where she became concerned people may

18

be taking advantage of Melissa. Similarly, Angali's attorney testified that the events unfolding at the courthouse on June 4 even confused him to the point that he "didn't understand what was going on, and [he] was concerned about that."

The court of appeals concluded that the psychiatrist's testimony at trial regarding voluntariness was equivocal because, when asked if Melissa's decision to sign the affidavit was a voluntary one, he testified, "I do not know." ___ S.W.3d at ___. The court of appeals also noted that the psychiatrist stated that he had discussed giving up the child with Melissa. *See id.* at ___. The evidence most heavily relied upon by the court of appeals was Melissa's testimony that she signed the affidavit to allow Angali "to have the baby and that I would still be able to be involved with the baby's life," which, according to the court of appeals, could be viewed by the jury as showing that Melissa understood that she was changing her rights by signing the affidavit. *See id.* at ___. Ultimately, the court of appeals held that because there was evidence going both ways, a reasonable jury could form a firm belief that Melissa knowingly and intelligently signed the June 4 voluntary relinquishment affidavit. *See id.* at ___.

There are several problems with the court of appeals' analysis. First, Melissa's testimony that she thought her mother would get the child and that she would still be involved with the child's life flies in the face of the court of appeals' reasoning that the jury could conclude that Melissa could obviously read and understand the affidavit. *See id.* at ___. The affidavit designated DFPS as managing conservator, not Angali, and did not include any language regarding post-termination contact, as any language to that effect is prohibited by the Family Code. *See* TEX. FAM. CODE § 161.103(h). Moreover, the counselor testified, "if [the affidavit] was in lawyer jargon, I would be surprised if she would have known what she signed. . . . I don't think [Melissa] would be able to

19

have the comprehension to read through the relinquishment and understand it." Likewise, Angali's attorney testified that, at the two previous unsuccessful attempts to transfer custody to Angali, Melissa needed an explanation of what she was signing, would sign legal documents without reading them, and did not know what she was signing. The testimony regarding Melissa's execution of the June 4 affidavit can lead to only one conclusion—she did not understand the document she was signing.

Second, the court of appeals misplaced the burden of proof. DFPS bore the burden of proving voluntariness by clear and convincing evidence. *See, e.g.*, *Djeto*, 928 S.W.2d at 97. It is uncontroverted that Melissa has an IQ of, at most, 70 and was diagnosed as borderline intellectual functioning. The testimony that she reads at a second-grade level was also uncontroverted. The only evidence to support the jury's verdict that Melissa knowingly and intelligently executed the affidavit of relinquishment is the testimony by her psychiatrist that they had discussed giving up the child, and testimony from her counselor that Melissa "seemed to have a good grasp" on the pros and cons of relinquishing her rights as everything was explained to her in a controlled, clinical setting. Testimony about the actual events on June 4, however, reveals a much different setting where Melissa did not understand the nature of the proceeding or the ultimate effect of the affidavit she signed. There is absolutely no evidence in the record, other than the language of the affidavit itself, that on June 4, 2010, Melissa understood the consequences of signing the affidavit—that she would be permanently and irrevocably severing her relationship with her daughter and handing over custody to DFPS, not her mother, with no guarantees that she would ever see her daughter again.

The evidence in support of the jury's verdict—even though it may do more than raise surmise and suspicion—is not capable of producing a firm belief or conviction that Melissa knowingly and

20

intelligently irrevocably relinquished her parental rights. *See Garza*, 164 S.W.3d at 621. Having reviewed all the evidence in the record under the clear and convincing standard of proof, we conclude that the record before us does not contain evidence of that effect and quality. From the evidence in the record, we therefore hold that the jury could not have reasonably found by a "firm belief or conviction" that Melissa voluntarily executed the affidavit of relinquishment of her parental rights. *See* TEX. FAM. CODE § 161.001(1)(K).

Because the court of appeals affirmed on relinquishment grounds, it did not address Melissa's challenges to the jury's findings on other statutory grounds for termination. ___ S.W.3d at ___ (citing TEX. R. APP. P. 47.1). Melissa and Angali raised these issues in their briefing before this Court, but we lack jurisdiction to review those factual sufficiency challenges. *See* TEX. CONST. art. V, § 6(a); *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Accordingly, we remand the case to the court of appeals to consider the factual sufficiency of the evidence to support the jury's findings on the other statutory grounds for termination. TEX. R. APP. P. 53.4, 60.2(d).

### C. Legal Sufficiency Challenge to the Best Interest Finding

The Family Code requires that the jury find, by clear and convincing evidence, that termination of parental rights is in the child's best interest. TEX. FAM. CODE § 161.001(2). Here, we must consider whether the evidence is legally sufficient to support the jury verdict that termination of Melissa's parental rights was in K.M.L.'s best interest. Only if no reasonable juror could form a firm belief or conviction that termination of Melissa's parental rights was in K.M.L.'s best interest can we conclude that the evidence is legally insufficient. *In re J.F.C.*, 96 S.W.3d at 266.

In *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), we established a non-exhaustive list of factors to consider in determining the best interest of a child, including: (1) the emotional and

21

physical needs of the child and the emotional and physical danger to the child now and in the future; (2) the parental abilities of the individuals seeking custody; (3) the plans for the child by those individuals and the stability of the home; and (4) the plans for the child by the agency seeking custody and the stability of the proposed placement. *See id*. at 371–72. We address these relevant factors in turn.

The emotional and physical needs of the child now and in the future and the emotional and physical danger to the child now and in the future are the first factors we consider. K.M.L. is still a young child. There is evidence that she was regressing in her development. DFPS testimony indicated concern about K.M.L.'s safety in Angali's home, as DFPS had intervened numerous times in Angali's home. Additionally, the DFPS investigator testified that Angali appeared to be under the influence of drugs on the day of K.M.L.'s accident, with her speech slurred, her eyes droopy, and her movements slow. Angali, at one point, admitted to using marijuana and driving the children while under its influence. As to competing evidence, the jury heard testimony from the CASA volunteer that Melissa had bonded with her child, loved and missed her child, and continued to check on the child. Angali testified that, before the accident, she and K.M.L. engaged daily in learning activities, that K.M.L. rarely watched television, that K.M.L. did not have sleeping difficulties, and that K.M.L. was potty trained, so she must have regressed in foster care. However, given that K.M.L. was seriously injured while in Angali's care, Angali's history of DFPS intervention, and the plan for Angali to be present and help raise K.M.L., these factors weigh in favor of the conclusion that termination was in K.M.L.'s best interest.

Another relevant factor is the parental abilities of the individuals seeking custody. *Id.* at 372. Even Melissa and Angali acknowledge that Melissa, on her own, cannot adequately meet K.M.L.'s needs. This factor clearly weighs in favor of termination.

Next, we consider the plans for the child by Melissa and the stability of the home. *See id.* While Melissa acknowledges that she cannot adequately provide for K.M.L., she argues that termination of her parental rights was not in K.M.L.'s best interest because Angali would help in raising K.M.L. DFPS, however, argues that the relationship between between Angali and Melissa was and is very tumultuous and would not ensure a stable home. The jury was made aware of Melissa and Angali's strained relationship from testimony that Angali sent Melissa away after K.M.L. was born and that, since her teenage years, Melissa has never resided with her mother for an extended period of time. Additionally, DFPS testimony suggested that Angali lacks the ability to provide a safe environment for K.M.L. due to a past history of domestic violence and the possibility of drug usage. A DFPS supervisor testified that Angali's home was not an appropriate placement as DFPS had been involved with the family long before K.M.L.'s birth for abuse allegations with Melissa's little brothers, though no action was ever taken. Angali testified that both she and Melissa suffer from bipolar disorder. Additionally, Melissa planned to live with Angali, creating a risk for more instability. Thus, these factors also weigh in favor of termination.

Finally, considering the plans for the child by the agency seeking custody and the stability of the proposed placement, the evidence introduced at trial reflects favorably on the foster care placement. The foster mother testified that K.M.L. was thriving in the foster home and that she and her husband planned to adopt K.M.L. The CASA volunteer testified that placement in this foster

home was in the child's best interest. These factors weigh in favor of the foster care placement and in favor of termination.

Considering the *Holley* factors and the evidence at trial, it is clear that the jury could reasonably form a firm belief or conviction that termination of Melissa's rights was, in fact, in K.M.L.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266. The evidence favoring a decision contrary to that reached by the jury is not so significant that no reasonable juror could have formed a firm belief or conviction that termination is in K.M.L.'s best interest. *See id.* We overrule Melissa and Angali's third argument.

### D. Summary as to Melissa and Angali

We hold that termination was improper under Family Code section 161.001(1)(K) based on Melissa's June 4, 2010 affidavit of relinquishment of parental rights. However, we also hold that there is legally sufficient evidence that termination of Melissa's parental rights was in K.M.L.'s best interest. The court of appeals did not address the other three grounds for termination, ___ S.W.3d at ___ (citing TEX. R. APP. P. 47.1), which Melissa and Angali properly raised as factual sufficiency challenges in the court of appeals. Accordingly, we remand the case to the court of appeals to determine whether the evidence is factually sufficient to support a finding by the jury under subsections (D), (E), or (O) of section 161.001(1). *See* TEX. R. APP. P. 53.4, 60.2(d).

### III. John's Issues

John also petitioned this Court for review. His petition raises three issues: (1) whether he waived his right to notice of the termination hearings by appearing at trial after being subpoenaed; (2) whether the jury's finding that John constructively abandoned K.M.L. is supported by legally sufficient evidence; and (3) whether the trial court erred in failing to make an indigence

determination, failing to appoint an attorney ad litem for John when he had not yet submitted an affidavit of indigence, and failing to admonish John that he had the right to an attorney. Because we find the first issue determinative, we do not reach the other two issues.

John argues that he did not receive notice of the termination hearings and did not waive notice by appearing at the trial. Family Code section 263.301(a) provides, "[n]otice of a permanency hearing shall be given as provided by Rule 21a, Texas Rules of Civil Procedure, to all persons entitled to notice of the hearing."[10] Rule 21a provides that citation may be served by

> delivering a copy to the party to be served, or the party's duly authorized agent or attorney of record, as the case may be, either in person or by agent or by courier receipted delivery or by certified or registered mail, to the party's last known address, or by telephonic document transfer to the recipient's current telecopier number, or by such other manner as the court in its discretion may direct.[11]

TEX. R. CIV. P. 21a.

After John filed a general appearance and answer in opposition on May 3, 2010, acknowledging his paternity of K.M.L. and providing both his address and telephone number, he became entitled to ten days' notice of any permanency hearing under section 263.301. *See* TEX. FAM. CODE § 263.301(a), (b)(3). It is undisputed that John did not receive notice of the four permanency hearings held after his May 3, 2010, answer but before the trial on January 18, 2011. In fact, at two of the hearings—the May and October 2010 hearings—the trial court issued orders finding that John did not receive proper notice. At the two other hearings, in June and August, DFPS

---

[10] While the Legislature amended Texas Family Code section 263.301 in 2013, *see* Act of May 20, 2013, 83rd Leg., R.S., Ch. 885, § 1, 2013 Tex. Gen. Laws 2232, 2232, only subsection 263.301(b) was amended. We refer to the current version of the statute for the purposes of subsection 263.301(a).

[11] Effective January 1, 2014, Rule 21a was amended and reorganized such that the quoted language is now subsection (a). *See* 2013 TX ORDER 0010, No. 13-9128 (Aug. 16, 2013). However, the relevant language did not change in substance.

employees testified that John was served only by publication, a manner of citation not authorized by Rule 21a. *See* TEX. R. CIV. P. 21a.

John's lack of notice of the permanency hearings has significance in two ways. First, one of the grounds under which John's parental rights were terminated is section 161.001(1)(O)—failure to comply with the provisions of a court order specifically establishing the actions necessary for the parent to obtain the return of the child who has been in DFPS custody for at least nine months as a result of an abuse or neglect removal. *See* TEX. FAM. CODE § 161.001(1)(O). The court of appeals did not address his lack of notice of the permanency hearings because it affirmed termination on constructive abandonment grounds, an independent basis from the jury's findings relating to the permanency hearings. *See* ___ S.W.3d at ___. But second and more importantly, John's failure to receive notice of the permanency hearings has implications as it relates to his lack of counsel and his due process rights. While we note our concern about DFPS's admitted and repeated failure to notify a parent about proceedings in a termination suit, we need not resolve the case on these grounds because the record indicates that DFPS may have erred in failing to provide John notice of trial.

Rule 245 of the Texas Rules of Civil Procedure provides that a trial court "may set contested cases on written request of any party, or on the court's own motion, with reasonable notice of not less than forty-five days to the parties of a first setting for trial, or by agreement of the parties." TEX. R. CIV. P. 245. If a timely answer has been filed in a contested case or the defendant has otherwise made an appearance, due process rights are violated when a judgment is subsequently entered without the party having received notice of the setting of the case, *Peralta v. Heights Med. Ctr.*, 485 U.S. 80, 86–87 (1988), even when that party previously waived notice of citation. *See Delgado v. Hernandez*, 951 S.W.2d 97, 99 (Tex. App.—Corpus Christi 1997, no writ); *Gonzalez v. State*, 832

S.W.2d 706, 706–07 (Tex. App.—Corpus Christi 1992, no writ). A trial court's failure to comply with the notice requirements in a contested case deprives a party of his constitutional right to be present at the hearing and to voice his objections in an appropriate manner, resulting in a violation of fundamental due process. *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965).

The record does not show that John was served with actual notice of the trial setting. In his original answer, John provided his sister's address, where he resided at the time of trial. No return receipt of citation was included in the clerk's record, although the appellate rules do not require such documents to be automatically included in the clerk's record absent specific request, and DFPS did not request it, even though it knew that notice was being challenged.[12] *See* TEX. R. APP. P. 34.5(a), (b)(2). Additionally, in this regard, the question of whether John had constructive notice of trial is, at most, inconclusive. John testified that he knew about the termination suit and had previously met with Angali's attorney. However, John appeared at trial under subpoena and, according to his testimony, was driven by a district attorney or possibly a police officer. When asked if he was given notice of the trial, John responded, "I have never gotten anything," and that he "didn't get anything in the mail." Failure to give a parent notice of pending proceedings "violates the most rudimentary demands of due process of law." *Peralta*, 485 U.S. at 84 (quoting *Armstrong*, 380 U.S. at 549) (internal quotations omitted). Given the constitutional implications of parental rights termination cases, *see In re E.R.*, 385 S.W.3d at 554, and John's statements on the record that he did not receive notice of trial, and absent any evidence to the contrary, we must conclude that John did not receive notice of trial. *See Gonzalez*, 832 S.W.2d at 707.

---

[12] In fact, DFPS made no requests for the appellate record, as the sole designation of items to be included in the clerk's record was filed by Angali. If, in fact, John was properly served, as soon as John raised this issue in his motion for new trial, DFPS could easily have requested that the return receipt be included in the appellate record.

DFPS next argues that John waived notice by appearing at trial and not moving for a continuance. The due process right to notice prior to judgment is subject to waiver. *D.H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 405 U.S. 174, 185 (1972). But such waiver must be voluntary, knowing, and intelligently waived. *See id.* at 185–86. It is true that John attended and participated in all four days of trial and did not request a continuance based on his lack of notice. However, John was told by the trial judge on the first day of trial that it was too late for him to be appointed an attorney and that nobody would be looking out for him anymore. Further, John appeared at trial under subpoena and testified that, "I have a lot of stuff going through my head right now, and it's very difficult to sit up here, and be this nervous, and try not to burst into tears over y'all not letting me see my little girl." The due process requirement of notice must be provided "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong*, 380 U.S. at 552). And, while we "certainly agree that pro se litigants are not exempt from the rules of procedure," when a determination "turns on an actor's state of mind . . . , application may require a different result when the actor is not a lawyer." *See Wheeler v. Green*, 157 S.W.3d 439, 444 (Tex. 2005) (per curiam). Based on the record before us, we cannot conclude that John voluntarily, knowingly, and intelligently waived his due process right to notice of trial by sitting, under subpoena, through trial without any help from counsel and failing to formally move for continuance. John raised this complaint in a motion for new trial, and the trial court erred by not granting that motion. "Only that would have wiped the slate clean. Only that would have restored [John] to the position he would have occupied had due process of law been accorded to him in the first place." *Armstrong*, 380 U.S. at 552.

28

## IV. Conclusion

We hold that the evidence is legally sufficient to support the jury finding that termination of Melissa's parental rights was in K.M.L.'s best interest. However, we also hold that termination of her parental rights under section 161.001(1)(K) was improper because there is legally insufficient evidence that she executed the affidavit of voluntary relinquishment knowingly and intelligently. We reverse that portion of the court of appeals' judgment regarding termination under section 161.001(1)(K) and remand the case to the court of appeals to consider the factual sufficiency of the other three grounds for terminating Melissa's parental rights.

We hold that John was entitled to notice of the permanency hearings and the trial and that he did not waive that right to notice by appearing at trial, as the record does not show that he appeared voluntarily such as to waive his constitutional due process right to notice. This lack of notice renders any judgment unenforceable and void. Accordingly, we reverse the judgment of the court of appeals as it relates to John and remand the case to the trial court for a new trial.

_____
Paul W. Green
Justice


OPINION DELIVERED: August 29, 2014

29