

# NUMBER 13-20-00020-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF C.C.M., C.M., C.C.M., C.C.M., CHILDREN

## On appeal from the County Court at Law of Aransas County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Hinojosa**
**Memorandum Opinion by Chief Justice Contreras**

This appeal concerns the parental rights to minor children C.C.M., C.M., C.C.M., and C.C.M.[1] Appellant R.C.M., the biological mother of the children, contends by one issue that the evidence was legally and factually insufficient to support a finding that termination of her parental rights was in the children's best interests. We affirm.

---

[1] We refer to the children and their parents by their initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

## I. BACKGROUND

The four female children at issue in this case were born in 2009, 2010, 2015, and 2016. At the termination trial,[2] Leslie Mayfield testified that she was an investigator for appellee, the Department of Family and Protective Services (the Department), from 2017 to 2019. On November 24, 2018, the Department received a report that R.C.M. was using "illegal substances in sight of the children"; that she was "using rent money to support her drug habits"; that she did not have a "clean environment to live in or food for the children to eat"; and that the children "were constantly missing school" because R.C.M. did not have clean clothes for them. Three days later, Mayfield made contact with R.C.M. and the children at a motel in Aransas Pass, and she asked R.C.M. to take an oral swab drug test. R.C.M. agreed and told Mayfield she would test positive for marijuana; in fact, the test returned negative for marijuana but positive for methamphetamine. When Mayfield returned to the motel to inform R.C.M. of the drug test result, she discovered R.C.M. and the children were no longer there. Mayfield later learned that R.C.M. had been incarcerated and the children were staying with their aunt.

According to Mayfield, she was concerned about the children staying with their aunt because the aunt "was unable to obtain a power of attorney" from the children's parents "in order to continue meeting the children's medical and educational needs." For example, on January 3, 2019, the oldest child had to be taken to the emergency room due to a "bad rash on her neck and head," but she could not receive any follow-up care because the aunt did not have health insurance and was not authorized to obtain medical

---

[2] The trial also concerned the parental rights of the children's father, R.M. The parents were each represented by counsel at trial; R.C.M. appeared personally by telephone, whereas R.M. did not appear. The judgment on appeal terminates both parents' rights to the children. R.M. is not a party to this appeal.

care for the children.

Mayfield testified that the Department had previously been involved with the family in 2009, when both parents tested positive for marijuana; in 2010, when R.C.M. tested positive for drugs during a pre-natal exam, though she tested negative at birth; again in 2010, when there was a report alleging the oldest child "received a skull fracture with minimal explanation"; and in January 2017, when both parents tested positive for cocaine and marijuana, and one of the children admitted to "picking up something that started with a W that fell out of a cigarette and it was understood that weed had fallen out." According to Mayfield, this history was concerning because it "showed continued use of illegal substances and . . . failed attempts using family-based safety services to prevent removal." She stated the Department ultimately sought removal of the children because R.C.M. "was in jail, she tested positive for drugs, and we needed a legal way for the children to get the medical care that they needed."

Maddalena Robertson, a Department caseworker, testified that she was assigned to the case in December 2018. After an adversary hearing on January 18, 2019, Robertson made contact with R.C.M. and scheduled a meeting for January 24, but R.C.M. did not show up. When Robertson tried again to contact R.C.M. in March, the phone number she had for R.C.M. "was not accepting any phone calls." Robertson obtained a different phone number from R.C.M.'s mother, but she was not able to reach R.C.M. that way either. She was later able to set up a meeting with R.C.M. "for a family group conference at the end of March," but again, R.C.M. did not appear. She tried and failed to make contact with R.C.M. in April and May. Eventually, Robertson made contact with R.C.M. in July 2019 while R.C.M. was in the San Patricio County Jail. At that time, R.C.M.

3

explained to Robertson that she was previously absent from court because "she was afraid of getting arrested." Robertson stated R.C.M. "was worried about the children and wondering how the children were doing." By August, R.C.M. was released from jail, but Robertson did not have updated contact information for her. Robertson next met with R.C.M. in December 2019, again while R.C.M. was detained at the San Patricio County Jail. Robertson did not know how long R.C.M. is expected to be incarcerated, but she agreed that R.C.M. is facing a felony charge.

R.C.M. signed a service plan, proposed by the Department, requiring her to provide a safe home environment and to participate in supervised visitation, individual counseling, random drug testing, and substance abuse assessment. However, according to Robertson, R.C.M. did not participate in any visitation, did not submit to random drug testing, and did not undergo a substance abuse assessment.

Robertson stated that the children have been living in Rockport with their paternal grandmother M.S. since August 2019, and "[t]hey're doing very well" there. She stated that M.S. is able to meet all of the children's educational and medical needs and is willing to take care of the children long-term. Robertson said the children are "worried they would not get to see their father again," but are "upset that [R.C.M.] has not attempted to see them or to do anything to better her situation to have her back in their life." She opined that termination of both parents' rights would be in the children's best interests. On cross-examination, she agreed that there were no services which R.C.M. could have participated in at the San Patricio County Jail.

M.S. testified that she now supports termination of parental rights for both parents, though she initially believed that permanent managing conservatorship with permanency

4

care assistance (PCA) would be more appropriate.

With respect to R.C.M., the trial court found predicate grounds for termination under paragraphs (D), (E), (N), and (O) of family code § 161.001(b)(1), and that termination of her parental rights was in the best interests of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O), (b)(2). This appeal followed.

## II. DISCUSSION

### A.     Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.— Corpus Christi—Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

In reviewing the legal sufficiency of the evidence supporting termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.,* 163 S.W.3d 79, 85 (Tex. 2005); *In re L.J.N.*, 329 S.W.3d at 671. We must assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so, and we must disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

When reviewing the factual sufficiency of the evidence supporting termination, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1); and (2) termination is in the best interest of the child. TEX.

6

FAM. CODE ANN. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84. Here, only the best interest finding is at issue.

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Factors that we consider in determining whether termination of parental rights is in a child's best interest include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all nine *Holley* factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 25, 27.

**B.    Analysis**

As to the first *Holley* factor, Robertson stated that, though the children are "worried" about not seeing their father again, they did not express such concerns about their mother; rather, they were "upset that [R.C.M.] has not attempted to see them or to do anything to better her situation to have her back in their life." There was no other evidence concerning the desires of the children.

As to the second *Holley* factor, there was no evidence that the children have any

7

specific emotional or physical needs beyond those typical for their respective ages.

Relevant to the third *Holley* factor, regarding emotional and physical danger, is evidence of R.C.M.'s persistent use of illegal drugs. R.C.M. and R.M. both tested positive for marijuana in 2010; R.C.M. again tested positive for an unspecified drug at a pre-natal medical exam in 2010; both parents tested positive for cocaine and marijuana in 2017; and R.C.M. tested positive for methamphetamine in 2018. According to Mayfield, in 2017, one of the children admitted to picking up marijuana that had fallen out of a cigarette. A parent's drug use supports a finding that termination is in the best interest of the child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (noting that the fact-finder can give "great weight" to the "significant factor" of drug-related conduct by a parent). This evidence is also relevant to the fourth *Holley* factor, regarding parenting abilities; and the eighth factor, regarding acts indicating the parent-child relationship is improper.

Additionally, Mayfield testified that the Department received a report in November 2018 that R.C.M. was using drugs in front of the children, did not have a clean environment for the children to live in, and was unable to provide food or clean clothes for the children. Mayfield did not testify to these facts from her own personal knowledge; however, no party objected to the testimony. Therefore, even if the testimony is considered inadmissible hearsay, we must consider it in our analysis. *See* Tex. R. Evid. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay."). This testimony is relevant to the third, fourth, seventh, and eighth *Holley* factors.

With respect to services available to R.C.M., the fifth *Holley* factor, the evidence

established that R.C.M. failed to comply with her obligations under the Department's service plan regarding visitation, random drug testing, and substance abuse assessment. Although services were not available to R.C.M. while she was in jail, there was no explanation given for why she failed to comply with these provisions in 2019 during the months she was not incarcerated.

We finally consider the sixth and seventh *Holley* factors, concerning the plans for the children and the stability of the home or proposed placement. R.C.M. has not had stable employment or housing during the pendency of this case, and she has not kept Department representatives apprised of her whereabouts or contact information. When Mayfield first made contact with R.C.M., she was living with the children in a motel. When Mayfield returned to alert R.C.M. of her positive methamphetamine test, the family was no longer there. In fact, R.C.M. had been incarcerated, and though the children were staying with their aunt, R.C.M. did not ensure that the aunt had the authorizations necessary to provide the children with medical care. Later, R.C.M. failed to appear for at least two meetings with Robertson. She did not testify at trial and there is no other evidence in the record regarding her plans to provide the children with a stable, safe environment. At the time of trial, she was incarcerated and facing a felony charge. On the other hand, Robertson stated the children are doing very well in their current placement with M.S., who is able to meet their needs and is willing to care for them long-term.

A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *see* TEX. FAM. CODE ANN.

9

§ 263.307(a) (providing that, in considering whether parents are willing and able to provide a safe environment, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest"). A factfinder may consider the consequences of failure to terminate parental rights and may also consider that the children's best interest may be served by termination so that adoption may occur, rather than the impermanent foster-care arrangement that would result in the absence of termination. *See In re K.C.*, 219 S.W.3d at 931. The evidence set forth above shows that R.C.M. was unable to provide a stable environment for the children and therefore supports the trial court's best interest finding.

R.C.M. argues that the Department did not explain to M.S. that the PCA program would have provided M.S. with funds for childcare without the need to terminate the parent-child relationship. *See* TEX. FAM. CODE ANN. §§ 264.851–.856. She contends that M.S. testified termination was in the children's best interest only because M.S. believed adoption was the only way for her to receive financial assistance in caring for the children. R.C.M. notes correctly that terminating a parent's rights so that someone else can obtain financial subsidies upon adoption is not an appropriate basis on which to base a best interest finding. *See In re E.D.*, 419 S.W.3d 615, 619 (Tex. App.—San Antonio 2013, pet. denied). But here, when asked whether the Department tried to "convince" M.S. to support termination, Robertson testified that "[t]he options were explained to her." Though R.C.M. raises suspicion regarding M.S.'s abrupt decision at trial to support termination, she directs us to no evidence, and we find none, indicating that M.S. was unaware of the benefits available under the PCA program or that her decision to support termination was motivated by financial concerns.

Considering all the evidence in the light most favorable to the judgment, we conclude that a reasonable trier of fact could have formed a firm belief or conviction, based on clear and convincing evidence, that termination of R.C.M.'s parental rights was in the best interest of the children. *See In re J.L.*, 163 S.W.3d at 85. Further, the evidence to the contrary was not so significant as to preclude such a finding. *See In re J.F.C.*, 96 S.W.3d at 266. The evidence was legally and factually sufficient to overcome the strong presumption that keeping the children with their biological mother is in their best interest. *See* TEX. FAM. CODE ANN. § 153.131. We overrule R.C.M.'s issue on appeal.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed the
9th day of April, 2020.

11