In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO.  09-11-00083-CV

IN THE INTEREST OF K.M.L.

On Appeal from the 258th District Court
San Jacinto County, Texas
Trial Cause No. CV12547

## MEMORANDUM OPINION

In this parental rights termination case, which is before us on remand from the Texas Supreme Court, we consider the issues the appellants raised that we did not reach in their prior appeal. *See In re K.L.*, 442 S.W.3d 396 (Tex. App.—Beaumont 2012), *reversed by In re K.M.L.*, 443 S.W.3d 101 (Tex. 2014). After considering the issues not reached on the original submission of the appeal, we hold that legally and factually sufficient evidence supports the jury's finding that M.L., the child's mother, failed to comply with the provisions of a court-ordered

1

parenting plan.[1] *See* Tex. Fam. Code Ann. § 161.001(1)(O) (West 2014).[2] We overrule the appellants' challenge to that finding, and based on the jury's finding that M.L. failed to comply with the provisions of the plan, we affirm the trial court's judgment terminating M.L.'s rights.

## Background

The underlying facts and procedural history of this case are detailed in the Texas Supreme Court's opinion and in our prior opinion, as both discussed the evidence admitted in the course of the trial. *See K.M.L.*, 443 S.W.3d at 105-07; *K.L.*, 442 S.W.3d at 399-400. Briefly, however, this case arises from the Texas Department of Family and Protective Services's 2009 removal of K.M.L. from the home of A.T., her maternal grandmother, after K.M.L. fractured her jaw. K.M.L.'s injuries occurred when she fell onto a tile floor from stairs, not guarded by a rail or barrier, inside Grandmother's home. K.M.L. fell approximately six feet. K.M.L. was two when she fractured her jaw, and she was living with Grandmother and Grandmother's two sons, who were fourteen and twelve years old. Just before

---

[1]The trial court ordered the parenting plan based on the provisions in section 161.001(1)(O) of the Texas Family Code.

[2]We cite to the current version of the Texas Family Code because the post-trial amendments to the Family Code do not affect the outcome of this appeal.

K.M.L. fell, Grandmother left the children without adult supervision to run some errands.

In 2011, based on the jury's findings to support terminating the parental rights of both of K.M.L.'s parents, the trial court terminated their rights. Additionally, based on the jury's finding that the Department should serve as K.M.L.'s sole managing conservator, the trial court appointed the Department to be K.M.L.'s sole permanent managing conservator.

Issues on Remand

In its opinion, the Texas Supreme Court directed us to consider on remand "whether the evidence is factually sufficient to support a finding by the jury under subsections (D), (E), or (O) of section 161.001(1)." *K.M.L.*, 443 S.W.3d at 117; *see also* Tex. Fam. Code Ann. § 161.001(1) (West 2014). After the case was remanded, we invited the parties (Mother, Grandmother, and the Department) to file supplemental briefs. We requested the parties to file briefs addressing the factual sufficiency of the jury's findings on the following three issues: (1) whether Mother knowingly placed or allowed K.M.L. to remain in conditions or surroundings that endangered her physical or emotional well-being; (2) whether Mother engaged in conduct or knowingly placed K.M.L. with persons who engaged in conduct that endangered her physical or emotional well-being; and (3)

whether Mother failed to comply with the provisions of a court order that specifically established the actions Mother was required to take to obtain K.M.L.'s return. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O).

Mother and the Department filed supplemental briefs, but Grandmother did not supplement the brief she filed on original submission. However, Grandmother's attorney advised the Court in a letter after the deadline we set for the briefs that we should reach the legal sufficiency arguments that the appellants had raised on original submission. Therefore, she suggested we were required to address both the appellants' legal and factual sufficiency arguments, not just the factual sufficiency issues mentioned by the Supreme Court in its opinion. *See K.M.L.*, 443 S.W.3d at 117.

After carefully considering the parties' briefs and supplemental briefs, we conclude the issues that we must decide on remand are whether legally and factually sufficient evidence supports the findings that: (1) Mother "knowingly placed or knowingly allowed [K.M.L.] to remain in conditions or surroundings which endangered the physical or emotional well-being of the child[;]" (2) Mother "engaged in conduct or knowingly placed [K.M.L.] with persons who engaged in conduct which endangered the physical or emotional well-being of the child[;]" and (3) Mother "failed to comply with the provisions of a court order that

4

specifically established the actions necessary for [Mother] to obtain the return of [K.M.L.] who has been in temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent for abuse or neglect of the child."

## Standard of Review

In a legal sufficiency review of an order terminating parental rights, the evidence relating to a challenged finding is reviewed "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. . . . [and] disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*. If no reasonable factfinder could form a firm belief or conviction that the matter the Department was required to prove is true, we are required to render judgment in favor of the parent. *Id.*

With respect to a party's factual sufficiency arguments, we must "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. Under a factual sufficiency standard, the findings are sufficient unless, based on the entire record, the disputed evidence that could not

5

have been credited in favor of the finding is so significant that the jury could not have reasonably formed a firm belief or conviction that the challenged finding was true. *See id*. Additionally, "[i]f, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Parenting Plan

Because the challenges to the legal and factual sufficiency of the evidence concerning Mother's failure to comply with a court-ordered parenting plan are dispositive of the appeal, we address the arguments raised by the parties addressing the jury's finding on that issue first.

The evidence that was before the jury shows that Mother was an eighteen-year-old high school student in 2007 when K.M.L. was born. Mother's and Grandmother's relationship was not always harmonious. Over the next two years, Mother alternated between living with Grandmother and living with various friends and relatives. During the first two years of her life, K.M.L. lived primarily with Grandmother.

In August 2009, approximately three weeks before K.M.L. fell and fractured her jaw, Grandmother moved into a one-bedroom loft apartment. K.M.L. and

6

Grandmother's two sons were also living with Grandmother when she moved. The stairs to the loft in the apartment they moved into had no railing or gate. Before K.M.L. fell, Grandmother left the three children alone in her apartment to run errands. While Grandmother was away, K.M.L. fell from the stairs leading to the loft, fracturing her jaw and injuring her teeth and gums.

Following K.M.L.'s injury, the Department sought K.M.L.'s removal and filed a suit, in which it sought to terminate Mother's parental rights to K.M.L. Following an adversary hearing, the trial court appointed the Department as K.M.L.'s temporary managing conservator, appointed Mother as K.M.L.'s temporary possessory conservator, and ordered Mother, while the case was pending, to comply with the requirements of a written parenting plan that was established by the Department.

The Department, in its brief, contends the evidence introduced during the trial allowed the jury to form a firm belief that Mother failed to comply with the requirements of a court-ordered parenting plan. According to the Department, the evidence shows that Mother failed to meet the requirements of the parenting plan because she failed to obtain the parenting skills to provide K.M.L. with a safe and stable home. According to Mother and Grandmother, Mother complied with the safe and stable home requirement in the parenting plan based on her plans to

provide K.M.L. a place to live in Grandmother's home and to allow Grandmother to help her raise K.M.L. Mother does not claim that she can provide a place to live without relying on Grandmother or that she can, without Grandmother's help, provide a loving home: in her brief, Mother concedes that her "intellectual and educational hardships" prevent "her from providing [a loving home] of her own for her daughter."[3]

The record reflects that the trial court ordered that Mother comply with the Department's parenting plan as a condition of having K.M.L. returned to her care. The record further reflects that in September 2009, Mother signed the family service plan. In the plan, Mother acknowledged that the purpose of the parenting plan was to help her, by August 2010, provide K.M.L. a safe environment. Mother also acknowledged that her rights could be terminated if she was unable or unwilling to provide K.M.L. with a safe environment, that her progress would be evaluated based on her completion of the tasks and goals established under the plan, and that she needed to demonstrate that she had the ability to provide for K.M.L.'s safety and well-being. For example, one of the goals in the plan was that

---

[3]The evidence, some of which is discussed below, shows that before the removal occurred, both Mother and Grandmother had been diagnosed with and treated for bipolar disorder and borderline intellectual function.

Mother "acquire appropriate parenting skills to provide [K.M.L.] with a safe and stable home."

The record of the evidence admitted during the trial includes evidence from which a reasonable jury could conclude that Mother failed to acquire the skills necessary to provide K.M.L. a safe and stable home. Mother indicated at the trial that her plan was to allow K.M.L. to continue to live with Grandmother. However, whether Grandmother possessed the ability to give K.M.L. a safe and stable home was a matter that the Department addressed during the trial.

Amanda Jackson, a conservatorship supervisor for the Department, testified that given Grandmother's history in making poor decisions related to K.M.L.'s care, Grandmother's history with the Department regarding the care of her own children, Mother and Grandmother's "tumultuous relationship," and Grandmother's mental health history, she did not believe that it would be in K.M.L.'s best interest to reside with Grandmother.[4] Jackson testified that the Department had records from a 1997 or 1998 case involving Grandmother, and that the information she had reflects that Grandmother had threatened to kill herself and had made homicidal threats towards her husband and her children; Jackson explained that in her opinion, Mother was placing K.M.L. in danger by leaving her

[4]The same evidence may be probative of both the predicate issue and the best interest issue. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

9

with someone who had admitted having "homicidal thoughts towards her own kids." Jackson also testified, without objection, that Mother had not demonstrated "an ability to maintain a safe and stable household" in which "she could care for her child[.]" For example, according to Jackson, prior to the trial, Grandmother suggested that K.M.L. could be placed with a man that Child Protective Services had investigated for allegedly sexually abusing Mother. Although the appellants dispute that Grandmother's home would not be a safe and stable place to raise K.M.L., the testimony by Jackson that she did not believe it would be safe and stable and the foundational facts that Jackson used to form her opinion were before the jury. We also note that the trial court's decision to admit Jackson's testimony has not been challenged on appeal. *See In re A.B.G.*, No. 09-11-00545-CV, 2013 WL 257311, at *8 (Tex. App.—Beaumont Jan. 24, 2013, no pet.) (mem. op.); *In re Commitment of Crosby*, No. 09-11-00371-CV, 2012 WL 983168, at **1-2 (Tex. App.—Beaumont Mar. 22, 2012, pet. denied) (mem. op.).

Sarah Miller, a special investigator with Child Protective Services, also testified that placing K.M.L. with Grandmother would not be suitable. According to Miller, leaving K.M.L. with Grandmother would be inappropriate given that Grandmother left K.M.L. in an apartment with dangerous stairs without adult supervision. Miller explained that this incident demonstrates that Grandmother is

10

neglectful. Miller also testified that Grandmother, during their initial meeting after the Department removed K.M.L., admitted that she used marijuana. The jury could reasonably form a firm conviction or belief from the evidence about Grandmother's past behaviors, which given her characteristics, there would likely be other incidents that would involve similar conduct. *See Wischer v. Tex. Dep't of Family & Protective Servs.*, No. 03-12-00165-CV, 2012 WL 3793151, at *7 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.).

Additionally, the jury could reasonably consider Grandmother's and Mother's relationship and their history of mental illness in evaluating whether Mother's plan for K.M.L. would give K.M.L. a safe and stable home. The testimony before the jury indicates that the Department referred Mother and Grandmother to a psychologist, Dr. Frankie Clark, and his records were admitted into evidence during the trial. According to Dr. Clark's report, Grandmother and Mother have bipolar disorders and borderline intellectual functions. Records introduced during the trial indicate that Grandmother's problems cause her to have severe mood swings, and that these problems are aggravated by family stress.

Before the Department removed K.M.L. from Grandmother's care, Mother and Grandmother were being treated by Dr. Athi Venkatesh, a psychiatrist, for their bipolar disorders. Dr. Venkatesh testified during the trial. According to his

11

February 2008 report, Grandmother was complaining chiefly about her mood swings and that she was suffering from bipolar disorder, a condition that had existed for 20 years. Although Dr. Venkatesh testified during the trial that Grandmother and Mother were doing fine and that Grandmother could safely care for K.M.L., his records and the other evidence before the jury allowed the jury to reasonably conclude that Grandmother would not continue to do well if she was responsible for taking care of K.M.L.

Dr. Venkatesh's records tend to show that Grandmother's condition does not remain stable. The psychiatrist's records show that Grandmother suffers from chronic mood swings, that her mood swings are treated with medication, and that the medications Grandmother is given for her problems have changed. Generally, Dr. Venkatesh's records show Grandmother has consistently denied having suicidal thoughts during the years she received treatment from Dr. Venkatesh, and they show that Grandmother's caregivers considered her risk of suicide to be low. Nevertheless, the records also reflect that Grandmother is being monitored at each visit for suicidal thoughts, and there are some entries suggesting that Grandmother has had thoughts of this type. For example, Dr. Venkatesh was asked about a note in his records relating to a statement Grandmother made in July 2009, which reflected that she did not continue having suicidal thoughts after she started taking

an antidepressant. Dr. Venkatesh indicated the note was made by his assistant, and he indicated that the assistant was ultimately terminated due to charting errors.[5]

While Dr. Venkatesh described that Grandmother was functioning well on her medications as of the date of the trial, his records allowed the jury to form a firm belief or conviction that, at times, Grandmother has exhibited impaired levels of function over the approximate three year period that Dr. Venkatesh had been caring for her. For example, Dr. Venkatesh's October 2010 appointment note indicates that Grandmother's mood swings are "getting worse and rages are occurring at times. She is confined to 'the couch[,]' not going out or socializing with others." In one of his records, dated November 2010, Dr. Venkatesh indicated that Grandmother had no improvement in her ongoing complaints of mood swings. His note on that day documents that Grandmother was irritable and easily frustrated. Another of Dr. Venkatesh's reports indicates that Grandmother had become severely depressed, noting that Grandmother "[h]as been overwhelmed with guardianship [and] court date for grand[d]aughter coming up, but coping well." The medical testimony before the jury allowed the jury to conclude that stress made Grandmother's symptoms worse, and to view Dr. Venkatesh's

---

[5]It is not clear whether or not Dr. Venkatesh thought this particular entry was due to his assistant's charting error; we note that during his testimony, Dr. Venkatesh testified that he was the person who made the notes in his chart.

testimony about Grandmother's condition at the time of the trial as a condition that was unlikely to remain stable over the course of K.M.L.'s childhood if Grandmother were to be given the responsibilities required by Mother's plan.

Both Mother and Grandmother testified during the trial that Mother completed all of the tasks required by her parenting plan. In her brief, Mother claims the Department unreasonably required her to obtain a residence on her own. However, that argument is not supported by the record, which includes Jackson's testimony that Mother needed to demonstrate that she had a stable house with an adequate support system to help her raise K.M.L.; Jackson did not indicate that the Department expected Mother to obtain a residence of her own. Moreover, there is also evidence in the record which indicates that Mother was a contributing factor to the stresses that Grandmother faced. For example, the jury heard testimony indicating that Mother resided with a series of unrelated individuals during the time K.M.L. was in the Department's care and that Grandmother was concerned about Mother's situation. Grandmother explained that Mother tends to leave when she gets upset because she just "needs a little bit of a break, so she will go and she will spend some time with her friends, and she will come back home." While Mother's plan heavily involved Grandmother, the jury could form a firm belief or conviction that given their historical relationship, Mother's plan would not likely

create a stable home. Although the jury heard conflicting evidence and opinions, there is evidence supporting the jury's finding that Mother failed to comply with the parenting plan because she had not demonstrated that she had the capacity to provide K.M.L. with a safe and stable home.

The evidence supporting Mother's claim that her plan would provide K.M.L. a safe and stable home is not overwhelming. In August 2009, Mother was not living in Grandmother's home when K.M.L. was placed in the Department's care. Grandmother bought a trailer home several months after K.M.L. was placed in the Department's care. Grandmother was living in the trailer at the time of trial. Photographs of the trailer were admitted into evidence at trial. According to Grandmother, another trailer home is being delivered to the property so that Mother would have her own quarters. The Department does not argue that any defects exist in the physical conditions of Grandmother's home that would make the home a dangerous place for a child to reside. However, providing a safe structure for a child to live in is not the sole consideration the jury was required to use in determining if Mother's plan would allow her to provide K.M.L. with a safe and stable home.

We conclude that the jury could reasonably form a firm belief or conviction that Mother failed to comply with a court order that specifically established the

15

actions necessary to obtain the return of her child. *See* Tex. Fam. Code Ann. § 161.001(1)(O). The evidence allowed the jury to conclude that Mother's plan would not give K.M.L. a safe and stable home.[6] While Mother argues that a single accidental injury to K.M.L. while being cared for by Grandmother is insufficient to allow the jury to reject her plan, the jury was entitled to consider all of the evidence in resolving whether Grandmother's home would be a safe and stable place to raise K.M.L. The record reflects a history of instability that was not limited to a momentary lapse of judgment. Considering the evidence of the instability that had historically existed in the living arrangement, an arrangement not significantly different than the one Mother had provided to K.M.L. since her

---

[6]The Department requested that it be appointed as K.M.L.'s permanent managing conservator. *See* Tex. Fam. Code Ann. §§ 153.005, 263.404 (West 2014). The trial court instructed the jury to appoint Grandmother as sole managing conservator in preference to the Department unless the jury found from a preponderance of the evidence that appointing her was not in K.M.L.'s best interest. The jury found that the Department should be appointed sole managing conservator of K.M.L. The trial court's judgment includes findings that the appointment of Grandmother as permanent managing conservator is not in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, and that Grandmother is not appointed possessory conservator because appointing her would not be in the child's best interest and would endanger the child's physical or emotional welfare. We considered and overruled Grandmother's challenge to the conservatorship findings in our previous opinion, and those findings were not challenged in the Supreme Court. *See K.M.L.*, 443 S.W.3d at 108; *K.L.*, 442 S.W.3d at 412-13; *see also In re J.A.J.*, 243 S.W.3d 611, 615 (Tex. 2007).

birth, the jury could reasonably determine that Grandmother would frequently be required to be K.M.L.'s sole caregiver and that at times, Grandmother would not be capable of providing K.M.L. with the care she needed. We conclude that the jury could reasonably infer from the evidence that K.M.L.'s welfare would be at risk under the living arrangement that Mother proposed. *See In re I.G.*, 383 S.W.3d 763, 771 (Tex. App.—Amarillo 2012, no pet.) (noting that generally, a parent's substantial compliance with a court-ordered parenting plan does not excuse the parent's failure to comply with the court's order).

We further conclude that the evidence to the contrary of the jury's finding regarding Mother's plan is not so significant that no reasonable juror could have formed a firm belief or conviction that Mother failed to complete the requirements of the plan. We hold that the evidence is legally and factually sufficient to support the jury's finding by clear and convincing evidence. We overrule Mother's and Grandmother's issues that argue the evidence is legally and factually insufficient to support Mother's termination for failing to comply with her court-ordered parenting plan.

Endangerment—Conditions

We address the jury's endangerment findings because these findings were challenged but were not addressed in our original opinion. *In re K.L.*, 442 S.W.3d

17

at 405. In response to one of the questions in the charge, the jury found by clear and convincing evidence that Mother knowingly placed or knowingly allowed K.M.L. to remain in conditions or surroundings which endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). When the termination finding under review depends on section 161.001(1)(D), we examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). Based on the charge, the evidence in this case must show that Mother knowingly placed or allowed her child to remain in conditions that endangered her child's physical or emotional well-being. Consequently, in this case the evidence focuses on what Mother knew about the conditions in which K.M.L. was living immediately before K.M.L. fell and fractured her jaw.

While Grandmother suggests that she expected the railing for the stairs to be installed before she moved the family into the apartment, the finding that K.M.L. was endangered by her parent placing her in a dangerous condition depends on Mother's knowledge of the condition, not Grandmother's. In this case, the evidence does not show before K.M.L. fell, Mother knew that Grandmother left K.M.L. in the apartment without adult supervision or that Mother was aware the

18

stairs in the apartment Grandmother moved to were unprotected by rails. Evidence that a child is living in a dangerous environment will not support a finding under subsection (D) where the evidence does not show that the child's parent was aware of the dangerous condition. *See In re C.D.E.*, 391 S.W.3d 287, 296-97 (Tex. App.—Fort Worth 2012, no pet.).

In jury argument, counsel for the Department argued that Mother's knowledge of the endangering conditions of Grandmother's household could be inferred from Mother's voluntary statement of August 7, 2009. In that statement, Mother said: "And my opinion [is] that the [environment] that [K.M.L. is] in is not a very good one." When questioned about that statement at the trial, Mother suggested it was her response to K.M.L.'s injury, as opposed to a statement regarding Mother's personal knowledge of conditions that existed before K.M.L.'s accident. Mother's statement indicates she was aware that Grandmother was not providing an ideal environment, but evidence of a less-than-ideal family environment alone is insufficient to establish endangerment under the clear-and-convincing standard that is required in a termination case. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

We hold that the evidence is legally and factually insufficient to support the jury's finding that Mother knowingly allowed K.M.L. to remain in conditions that

endangered her physical or emotional well-being. We sustain Mother's and Grandmother's issues asserting the evidence is legally insufficient to support the jury's finding that Mother allowed K.M.L. to remain in conditions or surroundings which endangered her physical or emotional well-being.

## Endangerment—Conduct

The jury also found by clear and convincing evidence that Mother engaged in conduct or knowingly placed K.M.L. with persons who engaged in conduct that endangered K.M.L.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). In reviewing a conduct-endangerment finding, "[subsection (E)] requires us to look at the parent's conduct alone, including actions or omissions." *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied).

Mother argues that before K.M.L. fell, the evidence fails to show that she was aware that Grandmother might be dangerous. To establish endangerment, it is not necessary to show conduct that was directed at the child, but it "means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment[.]" *Boyd*, 727 S.W.2d at 533.

Grandmother moved into the loft apartment after Mother left K.M.L. in Grandmother's care. Mother was aware that Grandmother was mentally ill, and there is some evidence in the record that Grandmother was investigated by the

20

Department during Mother's childhood. However, there was no evidence in the record showing that when K.M.L. fell and was injured, Mother was aware that Grandmother had suffered from chronic and severe mood swings that created any danger to K.M.L. or knew that Grandmother left K.M.L. without proper supervision in an environment that could endanger K.M.L.'s physical or emotional well-being. We conclude there is legally insufficient evidence showing that Mother knew at the time of K.M.L.'s injury that Grandmother would leave K.M.L. unattended while K.M.L. was in her care. We sustain Mother's and Grandmother's issues challenging the legal sufficiency of the evidence supporting the jury's finding that Mother engaged in conduct or knowingly placed K.M.L. with persons who engaged in conduct which endangered the child's physical or emotional well-being.

## Conclusion

When a jury has found that termination is in a child's best interest, a single predicate finding on a ground justifying termination under the Family Code can support a judgment terminating a parent's rights. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). As discussed, legally and factually sufficient evidence supports the jury's finding that Mother failed to comply with her court-ordered parenting plan. In our previous opinion, we held that the jury's best interest finding was legally

and factually sufficient, and the Supreme Court overruled Mother's and Grandmother's arguments challenging the jury's best interest finding. *K.M.L.*, 443 S.W.3d at 116-17; *K.L.*, 442 S.W.3d at 407. Based on our conclusion that legally and factually sufficient evidence supports the jury's finding that Mother failed to comply with the terms of a court-ordered parenting plan, and based on the jury's best interest finding favoring the Department's claim that terminating Mother's rights was in K.M.L.'s best interest, we affirm the trial court's judgment that terminates M.L.'s parental rights to her minor child, K.M.L.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on December 15, 2014
Opinion Delivered January 29, 2015

Before McKeithen, C.J., Horton and Johnson, JJ.

22