

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-18-00347-CV

---

IN THE INTEREST OF R.P., A CHILD

---

On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 83,354-E, Honorable Carry Baker, Presiding

---

February 14, 2019

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PARKER, JJ.

T.L., mother of the child, R.P., appeals from a final order terminating her parental rights. Through a single issue, she contends the evidence was legally and factually insufficient to support a finding that the termination was in the best interest of the child. We affirm.

In reviewing whether the evidence is legally and factually sufficient to support termination, we apply the standards of review described in *In re K.M.L.*, 443 S.W.3d 101, 112-13 (Tex. 2014), and *In re K.V.*, No. 07-16-00188-CV, 2016 Tex. App. LEXIS 11091, at *6-8 (Tex. App—Amarillo Oct. 11, 2016, no pet.) (mem. op.). So too do we compare

the evidentiary record to the factors itemized in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) when assessing whether termination favors the best interests of the children.

The trial court found that the evidence established three statutory grounds warranting the termination. They involved T.L. 1) knowingly placing or allowing the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, TEX. FAM. CODE ANN. § 161.001(b)(1)(D), 2) engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child, *id.* § 161.001(b)(1)(E), and 3) failing to refrain from using drugs after completing a court-ordered substance abuse treatment program. *See id.* § 161.001(b)(1)(P). That each ground was supported by both legally and factually sufficient evidence is not something T.L. questions on appeal. And, in opting to forego such an attack on those findings, T.L. tacitly conceded that sufficient evidence supported them. *See In re T.C.*, No. 07-18-00080-CV, 2018 Tex. App. LEXIS 6769, at *13 (Tex. App.—Amarillo Aug. 23, 2018, pet. denied) (mem. op.). More importantly, the evidence relevant to those grounds may be considered in assessing the best interests of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

So, our analysis begins with her tacit concession that the record evidence established she had endangered the child and failed to refrain from using drugs in a manner that endangered the health and safety of the child after completing a court-ordered drug treatment program. To that we add the following.

Katrina Sledge, an investigator with the Department of Family and Protective Services (the Department), testified that the Department had received a "positive hair follicle drug screens for [T.L.] and [R.P.], for methamphetamine. R.P. was six at the time.

T.L. initially denied drug usage but eventually admitted that she was a drug addict, had relapsed, and needed help. Her drug of choice was methamphetamine. Sledge also stated that R.P. could not be placed with a family member because they all used drugs, including the child's father, J.P.

LeAnn Moses, a caseworker for the Department, stated that a family plan was developed for the parents and the child. Initially, T.L. was working her plan satisfactorily and had completed several of the court-ordered services. After attending a drug rehabilitation program beginning in March of 2018, she stopped working her service plan, however. For instance, she was unemployed, lacked stable housing, and failed to attend required NA/AA meetings. Furthermore, immediately prior to beginning drug rehabilitation, she consumed methamphetamine. Whether due to residual drugs remaining from her March ingestion of methamphetamine or due to using the drug after completing rehabilitation, she tested positive for amphetamine and methamphetamine in May of 2018. So too did she fail to submit to mandated drug testing immediately before trial. T.L. believed that "she was clean and working her services and about to get her son back," which belief resulted in her forgoing additional therapy. And, despite being directed to participate in additional counseling sessions, she did not attend them. Other evidence indicated that she also failed to complete an intervention program known as Apple Project, attend NA/AA meetings (though she claimed she attended some inconsistently), comply with the recommendations of the providers, maintain or obtain stable employment, and maintain stable housing. Apparently, she resided with J.P. until a week before trial, moved out, and went to Oklahoma. She planned on remaining in Oklahoma, obtain a job there at a refinery (though she had yet to apply for it), and reside

3

with a friend in the friend's four-bedroom house. T.L. also indicated that she had been unemployed since April of 2018, in part due to her living with J.P who provided for her. Prior to moving in with J.P. in April of 2018, (after his release from incarceration), she lived in a rental property owned by her grandmother. She left that property because it had to be "shut down." But, while living in the rental unit, she worked for her grandmother in exchange for rent and utilities.

Other evidence disclosed that during his therapy sessions after being removed, R.P. "repeatedly act[ed] out good guy/bad guy scenarios with the therapist, and frequently state[d] that he needs to build up his strength so that he can protect his mom [T.L.] from his dad [J.P.]." This indicated the presence of domestic violence, according to Moses, which violence T.L. confirmed. T.L. also mentioned that J.P had "anger issues."

When asked what necessities she had provided for R.P. once he was removed, T.L. replied that she "wasn't aware [she] was supposed to provide for him." She, later, stated that she had on one occasion given him some clothes including an outfit and some socks but could not remember anything else. Furthermore, her visits with her son were inconsistent, and she missed the last two. The absences were attributed to lack of transportation. Such transportation (a Ford Explorer) had been obtained, though, within four days of trial. However, utilizing it would require her to renew her driver's license which expired several months earlier.

Evidence also indicated that R.P. initially experienced behavioral struggles after removal. The person with whom he was placed soon after removal asked that he be moved elsewhere due to his "lying, and stealing, [and] just general destructive [sic] and disregard for authority." Since being assigned to a foster home in April of 2018, though,

4

the six-year-old had made improvements. The goal was to place R.P. for adoption, though no potential adoptive family had been found for him. Nonetheless, the six-year-old revealed an apparent desire to return to T.L. and his love for her. T.L. expressed her desire that the Department remain R.P.'s permanent managing conservator, even though she did not want her parental rights terminated. Nor did she know how she would remain in contact with R.P. if she were to live and work in Oklahoma but nonetheless said she would "figure something out."

At the close of evidence, the trial court ordered both parents to submit to drug testing via hair follicle and urinalysis. The testing of T.L. proved positive for amphetamine, methamphetamine, and opiates, specifically codeine and morphine, thereby rendering incredible her representation about no longer abusing methamphetamine.

From the foregoing, we conclude that the entirety of the record before us contains evidence both legally and factually sufficient to support the finding that termination of T.L.'s parental rights was in the best interests of the children. Consequently, we overrule the sole issue and affirm the order of termination.

Per Curiam